## In re TRANSKARYOTIC THERAPIES, INC. SECURITIES LITIGATION.

### No. CIV.A. 03–10165–RWZ.

United States District Court, D. Massachusetts.

May 26, 2004.

Lauren Antonino, Chitwood & Harley, Atlanta, GA, Darren Check, Schiffrin & Barroway, LLP, Bala Cynwyd, PA, Brian M. Felgoise, Jenkintown, PA, Robert Finkel, Wolf Popper Wolf Ross & Jones, New York, NY, Paul J. Geller, Cauley, Geller, Bowman & Rudman LLP, Boca Raton, FL, Robert I. Harwood, Wechsler Harwood LLP, New York, NY, Marc S. Henzel, Bala Cynwyd, PA, Thomas Hutton, Shapiro, Haber & Urmy, LLP, Boston, MA, Fred Taylor Isquith, Wolf, Haldenstein, Adler, Freeman & Herz, New York, NY, Stephen G. Levy, Levy & Levy, PC, Stamford, CT, Sandy A. Liebhard, Bernstein, Liebhard & Lifshitz, LLP, New York, NY, David Pastor, Gilman and Pastor, LLP, Saugus, John C. Martland, Martland & Brooks LLP, Saugus, Charles J. Piven, Law Offices of Charles J. Piven, P.A, Baltimore, MD, Robert M. Roseman, Spector & Roseman, Philadelphia, PA, Anthony Vozzolo, Faruqi & Faruqi, New York, NY, Michael K. Yarnoff, Schiffrin & Barroway, LLP, Bala Cynwyd, PA, Steven J. Toll, Cohen, Milstein, Hausfeld and Toll, Washington, DC, Evan J. Smith, Brodsky & Smith LLC, Bala Cynwyd, PA, Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Boston, MA, David Randell Scott, Scott & Scott LLC, Colchester, CT, for Plaintiffs.

Nancy F. Gans, Moulton & Gans, PC, Boston, MA, Theodore M. Hess–Mahan, Shapiro, Haber, & Urmy LLP, Boston, MA, Leslie R. Stern, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, for movant.

Kimberly A. Bliss, Howard, Rice, Nemerovsky, Canady, Falk & Rabkin, San Francisco, MA, Michael G. Bongiorno, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Boston, MA, Roberto M. Braceras, Goodwin Procter, LLP, Boston, MA, David M. Brodsky, Latham & Watkins, New York, NY, Michael A. Collora, Dwyer & Collora, LLP, Boston, MA, Michael K. Fee, Ropes & Gray LLP, Boston, MA, Richard W. Gonnello, Latham & Watkins, New York, NY, Sarah A. Good, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, San Francisco, CA, David B. Hennes, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, Colleen Dunham Henschke, Hale & Dorr, LLP, Boston, MA, Randall Dana Katz, Ropes & Gray LLP, Boston, MA, Miriam Kim, Goodwin Procter, LLP, Boston, MA, Eric D. Levin, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Boston, MA, Kalama M. Lui–Kwan, Latham & Watkins, New York, NY, Douglas F. MacLean, Latham & Watkins, New-

ton, MA, Michelle D. Miller, Hale & Dorr, LLP, Boston, MA, Jeffrey B. Rudman, Hale and Dorr, LLP, Boston, MA, Anthony A. Scibelli, Scibelli and Whiteley, LLP, Boston, MA, Peter L. Simmons, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, Laurie B. Smilan, Latham & Watkins, Reston, VA, Joseph L. Stanganelli, Scibelli & Whiteley, LLP, Boston, MA, for defendants.

### MEMORANDUM OF DECISION AND ORDER

ZOBEL, District Judge.

Transkaryotic Therapies, Inc. ("TKT"), a publicly traded pharmaceutical company, developed a drug called Replagal for treating a rare genetic disorder called Fabry Disease. A competitor, Genzyme, was working on its own Fabry treatment. The Food and Drug Administration ("FDA") designated each product as "a drug for a rare disease or condition" pursuant to 21 U.S.C. § 360bb, meaning that if one received FDA approval for marketing the drug in the United States, the agency could not approve the rival product for seven years. 21 U.S.C. § 360cc(a). As a result, the two companies found themselves in a race for FDA approval. On January 14, 2003, FDA rejected TKT's drug and gave Genzyme the green light. A group of TKT shareholders have now filed a class action [1] against TKT, two former officers, six directors, and four investment banks that underwrote three secondary offerings of TKT common stock sold during the class period ("underwriter defendants"). The four-count Consolidated and Amended Class Action Complaint alleges a number of violations of the Securities Exchange Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b–5 promulgated thereunder.[2] Three groups of defendants—the underwriter defendants; TKT, its former President and CEO Richard F. Selden, and its directors ("TKT defendants"); and former Chief Financial Officer Daniel E. Geffken—have each filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

The Consolidated and Amended Complaint alleges that TKT initially applied for FDA approval on June 16, 2000. The application included test results from two

---

1. The class consists of all persons and entities that "purchased the common stock or call options, or who sold put options of TKT on the open market during the period January 4, 2001 through January 10, 2003, inclusive (the 'Class Period')" or that "purchased TKT common stock issued under and/or traceable to the Company's shelf Registration Statement/Prospectus dated December 13, 2000 and declared effective by the SEC on December 21, 2000 (the 'Registration Statement/Prospectus') and Prospectus Supplements dated June 25, 2001, December 12, 2001, or December 19, 2001."

2. Count I alleges that all defendants face liability under section 11 of the 1933 Act, 15 U.S.C. § 77k, for registration statements "contain[ing] an untrue statement of a material fact or omitt[ing] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." In addition, Count I alleges that defendant Selden has "controlling person liability" under section 15 of the 1933 Act, 15 U.S.C. § 77o. Count II alleges that the underwriter defendants are liable under section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l (a)(2), for offering or selling a security by means of a materially false or misleading prospectus or oral communication. Count III alleges that defendants TKT and Selden used fraud and deceit to inflate and maintain the market price of TKT stock and to cause plaintiffs to purchase TKT stock, in violation of section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. Count IV alleges that defendant Selden is further liable for such fraud and deceit as a "controlling person" under section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a).

controlled clinical studies[3] of Replagal known as TKT003 and TKT005 as well as interim data from TKT006, an uncontrolled, open-label continuation of TKT003. TKT003, which was conducted on 26 patients in collaboration with the National Institutes of Health, had the "primary endpoint" or goal of measuring Replagal's effect on serious pain in Fabry Disease patients, and the study additionally measured the drug's effect on kidney function and pathology. TKT005, conducted on 15 patients at the Royal Free Hospital in London, measured Replagal's effect on cardiac function in Fabry Disease patients, and it also tracked the effect on pain and kidney function.

In a "Complete Review Letter" dated December 22, 2000, the FDA's Center for Biologics Evaluation and Research ("CBER") denied approval for Replagal. This non-public letter stated bluntly and at length that both TKT003 and TKT005 "failed to demonstrate efficacy." Specifically, the letter stated that there was no statistically significant difference between patients in TKT003 and TKT005 who received Replagal and those who received placebos and that "[i]n several of these analyses, the outcome tended to favor the placebo group, i.e., patients receiving [Replagal] experience more pain than patients receiving placebo." The letter also noted that the studies showed no effect on renal function or cardiac enlargement or function. Furthermore, TKT003 was deemed to suffer from serious methodological deficiencies.[4] As a result, the letter concluded that "additional analyses or otherwise revised analyses of the clinical data you have submitted will be unable to address this deficiency. In order to provide substantial evidence of efficacy, we recommend that you conduct additional clinical studies and submit the results to the CBER."

TKT received the Complete Review Letter on January 2, 2001. The following day, it issued a press release stating that "[i]n the letter, the FDA has asked for further explanation in several areas and requested additional data." The release quoted defendant Selden saying, "While we are disappointed that the FDA did not approve Replagal at this time, we are working diligently to respond quickly to their requests for additional data."

From January 2001 until October 2002, TKT issued press releases, SEC filings and other statements repeating the formulation of the January 3 press release that the FDA's complete review letter "requested additional data and asked for further explanation in several areas."[5] The

---

3. In controlled clinical studies, the patients are divided into two groups, one that receives the drug and a second that receives a placebo, with neither patients nor doctors knowing which group has received which substance.

4. The Complete Review Letter faulted TKT personnel for

identify[ing] the data to include in the primary analysis after they were unblinded to the treatment assignments of the subjects. The process used to select which values to include in the primary analytical dataset introduced unmeasurable bias and is both inappropriate and unacceptable. We thus conclude there is no valid analysis of the primary endpoint of study TKT003.

5. On April 2, 2001, the company filed its year 2000 Form 10–K with the SEC, stating that "[i]n January 2001, the FDA issued a complete review letter which requested additional data and asked for further explanation in several areas." The Prospectus Supplements dated June 25, December 12, and December 19, 2001, included the following language:

The FDA letter stated that the data that we had provided was not adequate for approval of our [Biologics License Application, or BLA] at that time and requested additional information. In response to this letter, we have discussed our BLA with the FDA and have submitted additional data to the FDA. We expect that after the FDA has reviewed our additional data, it will either approve

company also touted Replagal's efficacy. On May 18, 2001, for example, a TKT press release stated that TKT005 demonstrated that Replagal helped to "revers[e] the cardiomyopathy of Fabry disease ...." A June 5, 2001, press release announced that the Journal of the American Medical Association was publishing the results of TKT003 and that the study showed that patients receiving Replagal "had a clinically significant reduction in severe, debilitating pain compared to no chance for the placebo group." The release further stated that patients taking Replagal experienced improved kidney and cardiac function.[6] Analysts who were studying the race for approval between TKT and Genzyme opined that Replagal's clinical efficacy gave TKT the edge. On May 2, 2002, defendant Selden stated in a conference call with investors, "We believe that the approval of Replagal in the U.S. remains a when not if proposition."

Amid the positive press releases and company statements, FDA's Endocrinologic and Metabolic Drug Advisory Committee ("Advisory Committee") scheduled Replagal and Genzyme's rival drug for consideration on September 27, 2002. A week before the meeting, however, TKT announced that it had been postponed. On October 2, 2002, TKT issued a press release stating that

> the FDA's review of the Replagal Biologic License Application for the postponed meeting expressed concerns regarding TKT's clinical data, particularly with respect to pain. The FDA indicat-

ed that methodological issues made the pain data uninterpretable and that data supporting the primary pain endpoint did not support approval.

At a conference call with investors held that same day, defendant Selden referred to "extensive discussions" held with FDA during the previous month in which "they were particularly critical of our pain data." He later expressed the belief that Replagal would be approved on the basis of renal and cardiac data. After the October 2 press release and conference call, TKT's stock price dropped 62%. The price dropped an additional 33% following a November 27, 2002, press release announcing that a second complete review letter "indicates that the FDA believes the data are inadequate for final approval action at this time, primarily because of continuing questions concerning efficacy ...."

The Advisory Committee eventually considered Replagal at a January 14, 2003, meeting. The Committee voted 15–0 that TKT's studies did not show proof of efficacy in the primary endpoints of pain or improved heart and kidney function. A second vote split 8–7 against recommending accelerated approval based on a different set of "surrogate endpoints." At the same meeting · the Committee recommended approval of Genzyme's rival product, and on April 24, 2003, FDA granted Genzyme the exclusive rights for seven years to market its Fabry Disease treatment in the United States. This lawsuit followed.

---

our BLA or decline to approve it. If it declines to approve our BLA, the FDA may request additional information, possibly including data from additional clinical trials. A Form S–3 amendment dated August 7, 2002, contained substantially the same information. In March, May and July 2002, TKT and defendant Selden issued press releases and made statements to the effect that TKT's continuing dialogue with the FDA gave the

company hope that Replagal would be approved at the end of 2002.

**6.** TKT also noted Replagal's efficacy in its year 2000 SEC Form 10–K; in press releases dated July 31, August 3 and 16, September 25, and October 16, 19, and 29, 2001; and February 11, 2002; and in an interview that Selden gave on May 2, 2002.

On a 12(b)(6) motion, the Court will assume that all facts alleged in the Complaint are true and will dismiss only if no set of facts states a claim for which relief can be granted. Counts I and II of the Complaint allege, pursuant to Sections 11, 15, and 12(2) of the 1933 Act, that TKT's Prospectus Supplements dated June 25, December 12, and December 19, 2001, contained "an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see also* 15 U.S.C. § 77*l*(a)(2). "[T]o avoid dismissal of their § 11 claim, plaintiffs must allege: (1) that Individual's prospectus contained an omission; (2) that the omission was material; (3) that defendants were under a duty to disclose the omitted information; and (4) that such omitted information existed at the time the prospectus became effective." *Cooperman v. Individual, Inc.,* 171 F.3d 43, 47 (1st Cir.1999). A fact is material if its disclosure "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citation and internal quotation marks omitted).

Counts III and IV allege liability for securities fraud under Section 10(b) and 20(a) of the 1934 Act and Rule 10b–5 for the numerous press releases and other public statements made by TKT and defendant Selden between the time the FDA issued its Complete Review Letter and the time FDA finally rejected TKT's application for approval of Replagal. "To state a cause of action under § 10(b) and Rule 10b–5, a plaintiff must plead, with sufficient particularity, that the defendant made a false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this statement or omission caused the plaintiff's injury." *Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir.1996). Pursuant to the Private Securities Litigation Reform Act, plaintiffs are required to allege specifically all misleading statements and the reasons why they are misleading. 15 U.S.C. § 78u–4(b)(1). Additionally, the Complaint must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." *Id.* at § 78u–4(b)(2).

■ As an initial matter, the underwriter defendants challenge plaintiffs' standing to sue under section 12(2) of the 1933 Act, which establishes civil liability for any person who "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements ... not misleading." "Section 12(2) applies exclusively to 'initial public offerings'" and not to aftermarket purchases. *Maldonado v. Dominguez,* 137 F.3d 1, 8 (1st Cir.1998) (citing *Gustafson v. Alloyd Co.,* 513 U.S. 561, 577–78, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)). The Consolidated and Amended Complaint alleges that only one plaintiff, Sara O. Buttner, bought stock pursuant to the December 12, 2001, offering and that the rest of the plaintiffs all made their purchases on the open market. The allegations relating to Buttner are sufficient to survive a motion to dismiss as to the December 12 offering and as to whether all underwriter defendants are "statutory sellers," but Count II is dismissed as to all other plaintiffs and as to the June 25 and December 19, 2001, offerings.

■ The underwriter defendants and defendant Geffken also contend that plaintiffs lack standing to raise a section 11 claim. Section 11 provides a cause of action for a materially misleading registra-

tion statement to "any person acquiring such security." 15 U.S.C. § 77k(a). In order to state a claim, aftermarket purchasers must be able to "trace their shares to an allegedly misleading registration statement." *DeMaria v. Andersen,* 318 F.3d 170, 178 (2d Cir.2003); *Cooperman v. Individual, Inc.,* No. 96–CV–12272–DPW, 1998 WL 953726, at *6 (D.Mass. May 27, 1998). Although defendants argue that the Complaint does not allege that plaintiffs' shares are traceable to a public offering, the Complaint specifically pleads that plaintiff Buttner purchased stock traceable to the December 12 offering. The other plaintiffs are alleged to have purchased their TKT shares on the open market, and there were tens of millions of shares traceable to stock offerings held prior to the Class Period. Therefore, the other plaintiffs have not sufficiently pleaded a section 11 violation. Accordingly, the motion to dismiss Count I is allowed as to all plaintiffs except Buttner and as to the June 25 and December 19, 2001, offerings.

■ All four counts of the Complaint hinge on plaintiffs' allegations that defendants failed to disclose or otherwise elided three aspects of the FDA Complete Review Letter: (1) the FDA's finding that TKT's studies did not show efficacy; (2) the FDA's statement that additional analyses or revised analyses of TKT's studies would not address the problems with efficacy and that TKT would have to conduct additional clinical studies; and (3) the agency's critique of TKT003's methodological flaws. Defendants [7] argue that the entire Complaint should be dismissed because TKT disclosed "the most relevant and disappointing aspect" of the December 22, 2000 FDA Complete Review Letter: that FDA denied marketing approval for

Replagal and requested additional data. *In re Biogen Sec. Litig.,* 179 F.R.D. 25, 39 (D.Mass.1997). In determining whether TKT is correct that this information was in fact "the most relevant and disappointing," the *Biogen* case is instructive. It involved an attempt by the pharmaceutical company Biogen, Inc., to obtain FDA approval of an anti-clotting drug: Several months after the Phase II clinical trials failed to show efficacy at its primary and secondary endpoints, the principal investigators mentioned this failure in an abstract submitted to the American College of Cardiology and at a conference. *Id.* at 31. Analysts reported the failure to show efficacy and downgraded the stock, and Biogen's stock price fell 8.25%, showing that the market had understood and assimilated the information. *Id.* at 32, 37. Because the failure to reach the primary endpoint was disclosed, Biogen was held to be under no further obligation to disclose additional information. *Id.* at 39.

In light of *Biogen,* which was decided on a summary judgment motion, the facts as alleged do state a claim that TKT made material omissions in withholding the FDA's opinion that TKT's studies did not show efficacy and were methodologically flawed and that in order to generate acceptable data, TKT would have to start over from scratch. The "most relevant and disappointing aspect" of the *Biogen* study was its failure to show efficacy— precisely the information that TKT did not disclose in the present case. Although TKT argues that the mere mention of the FDA's denial of approval would inform a reasonable investor that its studies did not show efficacy, such an assertion is plainly at odds with the facts alleged in the Complaint. Stock analysts not only failed to

---

**7.** Both the underwriter defendants and Geffken join in the TKT defendants' briefing of this issue.

equate the denial of approval with a lack of efficacy (see, e.g., Complaint at ¶ 99), but they also specifically concluded that TKT had the edge on Genzyme on efficacy grounds, comparing TKT's statements about the FDA's denial of approval to more expansive statements made by Genzyme regarding the denial of approval of its product. Additionally, while TKT attempts to draw a parallel to *Biogen* because its stock price experienced a 25.8% decline in the days following its January 3, 2001, press release, it is unclear at this point in the litigation what the drop in price means and whether it shows that the market understood the import of the Complete Review Letter. Analysts still seemed to favor TKT over Genzyme in the race for FDA approval, and by the following week, TKT's price had bounced back to a level close to its previous heights.[8]

Defendants further contend that TKT's optimistic statements about efficacy are not actionable because TKT had "ample reasonable basis for its belief that its studies showed efficacy"—namely, the publication of TKT's test results in two respected medical journals as well as Replagal's approval in the European Union, Norway, Iceland, New Zealand, the Czech Republic, Switzerland, Israel, Australia and Roma-

nia. At most, defendants argue, there was a "subjective scientific disagreement" over the efficacy of Replagal. But, this was not a mere scientific disagreement—the issue was approval to market the drug. Moreover, the failure to disclose the concerns raised in the highly negative Complete Review Letter—the conclusions of which were echoed by FDA's second Complete Review Letter at the end of 2002—makes TKT's trumpeting of Replagal's efficacy arguably misleading. A reasonable investor would believe from the public representations of TKT that FDA approval was, as defendant Selden said, "a when not if proposition." The existence of a subjective scientific disagreement over the efficacy of Replagal should have been made known to investors, particularly where the FDA comprised the side that strenuously contested the drug's effectiveness. As alleged by plaintiffs, the FDA's findings as to efficacy were material and should have been disclosed.

Regarding the FDA's concerns about the methodology of TKT003 and its opinion that TKT's clinical studies could not be salvaged, defendant first argues that TKT had no duty to disclose the agency's methodological criticisms. The two cases on which defendants rely are unavailing,[9] and

---

8. From January 3 to January 8, 2001, TKT's stock price dropped from 36.562 to 27.125, and by the following week it was trading at 35.125. By contrast, when TKT announced on October 2, 2002, that the "FDA indicated that methodological issues made the pain data uninterpretable and that data supporting the primary pain endpoint did not support approval," the stock price plunged 62%, from $33.25 to $12.75.

9. Defendants' reliance on *Padnes v. Scios Nova Inc.*, No. C–95–1693–MHP, 1996 WL 539711 (N.D.Cal. Sept.18, 1996), is misplaced. *Padnes* involved whether a pharmaceutical company was obligated to disclose its research methodologies where plaintiffs in hindsight believed that a Phase II study was

flawed. The present case involves the disclosure of *FDA's* grave reservations about TKT003. Plaintiffs are not arguing that TKT should have disclosed its methodology so that they could have determined on their own how reliable TKT003's results were. Rather, they allege that they should have been informed that the approving agency believed TKT's study was fatally flawed. Nor are defendants helped by the holding of *In re Medimmune, Inc. Sec. Litig.*, 873 F.Supp. 953 (D.Md.1995). In *Medimmune*, a motion to dismiss was allowed as to defendants' failure to disclose "random or sporadic" questions posed by the FDA to a pharmaceutical company during the review process because "[m]any, if not all, questions presumably get answered in the process." *Id.* at 966. Nevertheless, where

it appears that the failure to disclose FDA's serious criticism is a material omission, particularly in light of the company's race with Genzyme for FDA approval as well as the emphasis TKT placed on what its clinical trials revealed about the efficacy of Replagal. Defendants next argue that TKT satisfied any duty to disclose that the FDA informed TKT about the need for new clinical trials with the statement that the agency had "asked for further explanation in several areas and requested additional data." Although, as defendants state, "a request for 'additional data' *could* encompass a request for 'additional clinical studies,'" that is a far cry from disclosing that FDA had in fact recommended additional clinical studies. Again, in the context of a race for FDA approval, a recommendation that TKT perform what could amount to years of additional research is certainly material.[10]

■ The TKT defendants also seek to chip away at a number of forward-looking statements that plaintiffs allege are actionable—optimistic statements anticipating FDA approval, expressions of confidence that TKT would triumph over Genzyme in the race for approval, and statements to the effect that TKT looks forward to working with the FDA during the approval process and eventually to helping patients in the United States. The PSLRA establishes a "safe harbor" for any forward-looking statement that is "(i) identified as a forward-looking statement and is accompanied by meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial" or is made without actual knowledge that the statement was false or misleading. 15 U.S.C. §§ 77z–2(c)(1) & 78u–5(c)(1). A number of defendants' statements plainly fall within the safe harbor provisions.[11] Other statements, such as "We believe the approval of Replagal in the U.S. remains a when not if proposition" (Complaint, ¶ 177) and "We believe that the totality of our renal and cardiac data is compelling and we believe that Replagal can be approved on this data" (*id.*, ¶ 196), arguably do not fall within the safe harbor provisions. They are statements of present belief that are material and are conceivably in direct contradiction to known facts about the FDA's position with respect to TKT's data and

the FDA communicated methodological concerns "in such a way as to indicate that ultimate approval of [the drug] looked problematic," the motion to dismiss was denied as to statements that "could possibly have misled an investor into thinking that the review process remained totally problem-free." *Id.* at 968. At this stage of the litigation, plaintiffs' allegations resemble the latter scenario.

10. Similarly, the Prospectus Supplements all state that in the event that the FDA denied TKT's application to market Replagal, the agency "may request additional information, possibly including data from additional clinical trials." Such language is materially different from the fact that the FDA had, in essence, already made that request; indeed, the phrasing conceivably implies that the FDA's earlier request for additional information

tion did not include a request for data from additional studies.

11. These statements include all of the "statements of goals and plans for the future" identified by the TKT defendants on page 31, note 30, of their Memorandum In Support of Motion to Dismiss; pronouncements about the possibility of FDA approval, along the lines of "With the very real possibility of a 2002 approval, we're actively preparing for a product launch" (Complaint, ¶ 185) and "TKT believes that an Advisory Committee meeting will allow TKT to address FDA's concerns with regard to the renal and cardiac data and demonstrate the medically compelling nature of these data" (*Id.*, ¶ 194); and statements about the race for approval, enumerated on page 33, note 32, of the TKT defendants' Memorandum.

application for marketing approval. It is inappropriate to dispose of such statements on a motion to dismiss.

■ Finally, the TKT defendants contend that plaintiffs have failed to establish a strong inference of scienter, as required by 15 U.S.C. § 78u–4(b)(2). Plaintiffs plead that defendants made false or misleading statements with direct knowledge of the FDA's Complete Review Letter. "[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 83 (1st Cir.2002).

Accordingly, the underwriter defendants' and defendant Geffken's motions to dismiss are allowed in part. Except as to plaintiff Sara O. Buttner, who has adequately pleaded her causes of action stemming from the December 12, 2001, offering, Counts I and II are dismissed with respect to all plaintiffs and to the June 25 and December 19, 2001, offerings. The TKT defendants' motion to dismiss is allowed only as to the statements that fall within the PSLRA safe harbor provisions. The motions are otherwise denied.