**In re FRIEDMAN'S,
INC. SECURITIES
LITIGATION**

**No. 1:03 CV 3475 WSD.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 7, 2005.

David Andrew Bain, Lauren S. Antonino, Martin D. Chitwood, Meryl W. Edelstein, Chitwood & Harley, Everette L. Doffermyre, Jr., Martha Jane Fessenden, Doffermyre Shields Canfield Knowles & Devine, Corey Daniel Holzer, Christi A. Cannon, Holzer Holzer & Cannon, Atlanta, GA, Maya Saxena, Robert R. Adler, Milberg Weiss Bershad & Schulman, David A. Rosenfeld, Cauley Geller Bowman & Coates, Julie Prag Vianale, Vianale & Vianale, Boca Raton, FL, Peter E. Seidman, Steven G. Schulman, Milberg Weiss Bershad & Schulman, Daniel A. Osborn, Beatie & Osborn, Gregory M. Nespole, Wolf Haldenstein Adler Freeman & Herz, Jeffrey M. Norton, Robert I. Harwood, Wechsler Harwood, Marian P. Rosner, Patricia I. Avery, Wolf Popper, Mark C. Gardy,

Nancy Kaboolian, Abbey Gardy, Emily C. Komlossy, Jonathan M. Plasse, Goodkind Labaton Rudoff & Sucharow, New York City, Andrew L. Zivitz, Gregory M. Castaldo, Katharine M. Ryan, Marc A. Topaz, Schiffrin & Barroway, Marc S. Henzel, Office of Marc S. Henzel, Evan J. Smith, Brodsky & Smith, Bala Cynwyd, PA, Michael J. Pucillo, Berman Devalerio Pease Tabacco Burt & Pucillo, West Palm Beach, FL, Andrew M. Schatz, Jeffrey S. Nobel, Nancy A. Kulesa, Schatz & Nobel, Hartford, CT, Douglas M. Risen, Sherrie R. Savett, Berger & Montague, Philadelphia, PA, Jack Landskroner, Landskroner Grieco, Cleveland, OH, James E. Miller, James C. Shah, Shepherd Finkelman Miller & Shah, LLC, Chester, CT, Samuel H. Rudman, Cauley Geller Bowman Coates & Rudman, Melville, NY, Brent J. Savage, Robert Scot Kraeuter, Savage Turner Pinson & Karsman, Savannah, GA, for Plaintiffs.

Gregory Russell Hanthorn, Michael Joseph Mcconnell, Walter W. Davis, Jones Day, John Garrett Parker, Walter E. Jospin, Paul Hastings Janofsky & Walker, J. Marbury Rainer, Parker Hudson Rainer & Dobbs, Kimberly Lillian Myers, Tony Glen Powers, Rogers & Hardin, Stephen Earl Hudson, Kilpatrick Stockton, Elizabeth Vranicar Tanis, John A. Chandler, Kristin Beth Wilhelm, Patricia Anne Gorham, Sutherland Asbill & Brennan, Gary Alan Barnes, Gambrell & Stolz, J. Timothy Mast, Mckenna Long & Aldridge, Atlanta, GA, Joseph P. Armao, Lance Croffoot-Suede, Martin Bloor, Paul M. Alfieri,

White & Case, Michele Cerezo-Natal, Randall W. Bodner, Ropes & Gray, Gregory A. Markel, Jason M. Halper, Ronit Setton, Stacey A. Lara, Cadwalader Wickersham & Taft, New York City, Kirby D. Behre, Melissa G. Warren, Paul Hastings Janofsky & Walker, Washington, DC, Amie D. Rooney, Sullivan & Cromwell, LLP, Palo Alto, CA, Robert A. Sacks, Sullivan & Cromwell, LLP, Los Angeles, CA, Cameron S. Matheson, James A. Murphy, Leclair Ryan, Richmond, VA, for Defendants.

## ORDER

DUFFEY, District Judge.

This matter is before the Court on Defendant Ernst & Young's Motion to Dismiss Plaintiffs' Corrected Consolidated and Amended Class Action Complaint [62],[1] Defendant Sterling B. Brinkley's Motion to Dismiss [65], the Outside Director[2] Defendants' Motion to Dismiss Plaintiffs' Consolidated and Amended Class Action Complaint [66], Defendant Bradley J. Stinn's Motion to Dismiss Plaintiffs' Complaint [67], the Underwriter[3] Defendants' Motion to Dismiss Plaintiffs' Corrected Consolidated and Amended Complaint [68], Defendant Douglas Anderson's Motion to Dismiss the Consolidated and Amended Class Action Complaint [70], Morgan Schiff & Co., Inc., MS Jewelers Corp., and MS Jewelers LP's Motion to Dismiss [75, 76], ABN AMRO Rothschild LLC's Motion to Dismiss Plaintiffs' Corrected Consolidated and Amended Class Action Complaint [88], Defendant John

---

1. Defendant Friedman's, Inc. has also filed a motion to dismiss [64], but this action is stayed as to Defendant Friedman's, Inc. because the Company filed for protection under Chapter 11 of the United States Bankruptcy Code. (*See* Notice of Automatic Stay [140].)

2. The Outside Director Defendants' motion was filed on behalf of Defendants Cay, Cruickshank, Parshall and Pickup.

3. The Underwriter Defendants' motion was filed on behalf of Defendants McDonald Investments, Inc., JMP Securities, Wedbush Morgan Securities, Inc., Thomas Weisel Partners, LLC, and Morgan Joseph & Company.

Mauro's Motion to Dismiss Amended Complaint [96], and Phillip E. Cohen's Motion to Dismiss [108].[4]

## I. *BACKGROUND*

This is a federal securities class action brought against Friedman's, Inc. ("Friedman's" or the "Company"), certain of its officers and directors, Friedman's controlling shareholders, the Company's auditor, Ernst & Young LLP ("E & Y"), and the Company's underwriters for alleged violations of the federal securities laws. Plaintiffs bring this action on behalf of themselves and all others who purchased Friedman's common stock during the period from January 26, 2000 through and including August 20, 2004 (the "Class Period").

Plaintiffs allege claims under the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j, and the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k–1. Essentially, Plaintiffs contend Defendants engaged in significant accounting fraud, resulting in the overstatement of the Company's reported earnings and artificial inflation of the Company's stock purchased by Plaintiffs during the Class Period. Thirteen securities class action lawsuits were consolidated in this action under the Consolidated and Amended Class Action Complaint [52], filed on September 23, 2004.

### A. *Parties*

### 1. *Plaintiffs*

Lead Plaintiffs [5] bring this action on behalf of themselves and all others who pur-

chased Friedman's common stock during the Class Period. (Compl.¶ 1.) Alan Bortel ("Plaintiff Bortel"), also a Lead Plaintiff, asserts claims on behalf of: (i) a subclass of all persons who purchased or otherwise acquired Friedman's common stock pursuant to or traceable to the Shelf Registration Statement filed by Friedman's with the Securities and Exchange Commission (the "SEC") on or about December 28, 2001, from which the common stock sold in the Company's February 6, 2002 and September 19, 2003 public offerings originated (the "Section 11 Subclass"); and (ii) a subclass consisting of all persons who purchased or otherwise acquired Friedman's common stock "pursuant to the Registration Statement and/or the September 19, 2003 Prospectus" (the "Section 12 Subclass"). (Compl.¶ 1.)

### 2. *Defendants*

Defendant Friedman's is one of the largest specialty retailers of jewelry in the United States, operating over 700 stores in 20 states. (Compl.¶ 12(a).)

Defendant Victor M. Suglia ("Defendant Suglia") was the Company's Senior Vice President, Chief Financial Officer, Treasurer and Secretary from before the Class Period until November 11, 2003. (*Id.* ¶ 12(b).) Defendant Suglia was a signatory to the Company's Shelf Registration Statement filed with the SEC on December 28, 2001 (the "Registration Statement"). Defendant Suglia was also the Chief Financial Officer of Crescent Jewelers, Inc. ("Crescent"), an affiliate of Friedman's.[6] (*Id.*) Defendant Bradley J. Stinn

---

4. Also before the Court are Plaintiffs' Motion for Leave to File Excess Pages [103], Plaintiffs' Motion for Leave to File a Sur–Reply Memorandum [132], and Defendant Ernst & Young's Motion to Supplement [145].

5. Lead Plaintiffs include: Ardsley Partners, LP, Guerrilla Partners, LP, the Parker Family,

Doug Havel, and James A. Hammann. (Compl.¶ 11.)

6. Crescent is a specialty retailer of fine jewelry based in Oakland, California, which was affiliated with Friedman's through common ownership and executive management. (Compl.¶ 17.)

("Defendant Stinn") was the Company's Chief Executive Officer ("CEO") from before the Class Period until December 2, 2003. Defendant Stinn was a signatory to the Registration Statement and was also the Chairman and CEO of Crescent. (*Id.* ¶ 12(c).) Defendant Douglas Anderson ("Defendant Anderson") was the Company's President and Chief Operating Officer from September 2001 until June 29, 2004. (*Id.* ¶ 12(d).) Defendant John Mauro ("Defendant Mauro") served as Friedman's and Crescent's Controller at all relevant times. (*Id.* ¶ 12(e).) Plaintiffs refer to Defendants Suglia[7], Stinn, Anderson, and Mauro collectively as the "Individual Defendants."[8]

Defendant Phillip E. Cohen ("Defendant Cohen") owns Defendant MS Jewelers Corporation, which is the general partner of MS Jewelers Limited Partnership, which owns all of Friedman's Class B common stock.[9] (Compl.¶ 13(a).) Defendant Cohen also controls Crescent through his ownership of CJ Morgan Corporation, the general partner of CJ Limited Partnership, which owns most of the capital stock of Crescent. (*Id.* ¶ 13(a).) Defendant Morgan Schiff is an investment bank also controlled by Defendant Cohen, which provided the Company with advisory financial services. (*Id.* ¶ 13(c).) Plaintiffs refer to Defendants Cohen, MS Jewelers and Morgan Schiff collectively as the "Control Person Defendants."

Defendant Sterling B. Brinkley ("Defendant Brinkley") was Friedman's Chairman of the Board of Directors from before the Class Period until December 23, 2003.

(*Id.* ¶ 14(a).) Defendant Brinkley became the CEO of Crescent after resigning from Friedman's, and was Crescent's Chairman of the Board throughout the relevant period. Defendants John E. Cay, III ("Defendant Cay") and Robert W. Cruickshank ("Defendant Cruickshank") served as directors of Friedman's from before the Class Period until May 2004. (*Id.* ¶ 14(b)-(c).) Defendant David B. Parshall ("Defendant Parshall") was a director of Friedman's at all relevant times, and Defendant Mark C. Pickup ("Defendant Pickup") was a director of Friedman's from before the Class Period until April 2004. (*Id.* ¶ 14(d)-(e).) Defendants Brinkley, Cay, Cruickshank, Parshall and Pickup are referred to collectively as the "Director Defendants," and all signed the Registration Statement.

Defendants ABN AMRO Rothschild, LLC ("ABN"), McDonald Investments, Inc., and Wedbush Morgan Securities, Inc., were underwriters for Friedman's February 6, 2002 public offering. (*Id.* ¶ 15(a).) Defendants Thomas Weisel Partners, LLC, McDonald Investments, Inc., JMP Securities, Wedbush Morgan Securities, Inc. and Morgan Joseph & Co., Inc., were underwriters for Friedman's September 19, 2003 public offering. (*Id.* ¶ 15(b).) Plaintiffs refer to these Defendants collectively as the "Underwriter Defendants."

Finally, Defendant E & Y served as the Company's independent auditor. E & Y audited the Company's financial statements for fiscal years 2000, 2001 and 2002, and rendered unqualified audit opinions contained in the Company's Form 10–K's

---

7. Defendant Suglia did not file a motion to dismiss Plaintiffs' claims. On October 1, 2004, Defendant Suglia filed his Answer to Plaintiffs' Corrected Consolidated and Amended Class Action Complaint [63], asserting his Fifth Amendment rights in response to many of Plaintiffs' allegations.

8. Defendant Richard Cartoon was Friedman's Chief Financial Officer from December 8, 2003 until May 5, 2004. Plaintiffs have voluntarily dismissed all claims against him. (Notice of Voluntary Dismissal [134].)

9. The Class B common stock has the right to elect a majority of Friedman's Board of Directors. (Compl.¶ 13(b).)

for fiscal years 2000, 2001 and 2002. (Compl.¶ 16.) Defendant E & Y was also Crescent's auditor until May 15, 2004. (*Id.*)

## B. *Plaintiffs' Allegations*

Plaintiffs allege Friedman's violated Generally Accepted Accounting Principles ("GAAP"),[10] and that these violations caused Friedman's reported earnings for fiscal years 2000 through 2002, and the first three-quarters of 2003, to be overstated, artificially inflating the price of Friedman's common stock. Plaintiffs allege five categories of alleged GAAP violations: (1) failure to write down an impairment for the Company's investment in Crescent; (2) improper recognition of revenue; (3) understatement of allowance for uncollectible accounts; (4) overstatement of inventory; and (5) understatement of accounts payable, as part of the Company's alleged scheme with Crescent and Cosmopolitan to defraud Capital Factors. (Compl.¶¶ 137–84.) Plaintiffs claim this misconduct caused the Company's written and oral public statements during the class period to be false and misleading.

### 1. *Failure to write down impairment for investment in Crescent*

On March 15, 2004, Friedman's announced it expected to record a substantial impairment in its investment in Crescent in Friedman's fiscal 2003 financial statements. (Compl.¶ 118.) Plaintiffs allege Friedman's stated its investment in Crescent was recorded in accordance with Financial Accounting Standards No. 115 ("FAS115"), "Accounting for Certain Investments in Debt and Equity Securities." Plaintiffs claim, in reality, the Company did not comply with FAS115 because De-

fendants "disregarded that a write-down of Friedman's investment in Crescent should have occurred" earlier in the class period. (*Id.* ¶ 149.) Plaintiffs claim Defendants were aware of Crescent's deteriorated financial condition and value, and thus were aware of, or recklessly disregarded, the need for the write down at an earlier time. In support of this claim, Plaintiffs allege (i) Friedman's and Crescent shared common controlling ownership and executive management, (ii) E & Y audited both companies, (iii) Crescent lacked financial controls, and (iv) Crescent had a negative net worth. (*Id.*)

The Complaint alleges that on August 12, 2004, Crescent filed for Chapter 11 bankruptcy protection and Friedman's expects to "record a substantial impairment of its investment in Crescent in the Friedman's Inc. fiscal 2003 financial statements. Friedman's believes that financial information for Crescent previously included in Friedman's public filings should no longer be relied upon." (Compl.¶ 150.)

### 2. *Improper revenue recognition*

Plaintiffs allege the Company violated Accounting Concepts No. 5, paragraph 83 ("CON5")[11], regarding revenue recognition, for two reasons: (i) "it knew, or was severely reckless in not knowing, that it was making sales on credit to customers who had no realistic possibility of paying," and (ii) "it accepted merchandise in 'trade' and ascribed a higher value to it than was obtainable in the market." (Pls.' Opp'n to Def. Friedman's Mot. to Dismiss at 17; Compl. ¶¶ 151–52.) Plaintiffs allege a former Regional Partner stated that the Company would approve credit "for any-

---

**10.** GAAP "are the conventions, rules and procedures that constitute the professional standards of the accounting profession." *In re Miller Indus., Inc. Sec. Litig.,* 12 F.Supp.2d 1323, 1328 (N.D.Ga.1998).

**11.** CON5 provides "Revenues and gains are realized when products … are exchanged for cash or claims to cash." (Compl.¶ 151.)

one who wanted it, just so our daily [sales] goal was met." (Compl. ¶ 153.) Plaintiffs claim recognition of revenue from these sales was improper because Defendants knew there was a high probability these accounts would not be collectible. (Pls.' Opp'n to Def. Friedman's Mot. to Dismiss at 18.) Plaintiffs allege Friedman's disclosed, on November 17, 2003, that it would be increasing its allowance for uncollectible accounts from 10.5% to at least 17%. They allege this adjustment, which they claim is severe and inevitable from the Company's sales practices, was a result of the Company "extending credit to persons of questionable credit quality . . . ." (Compl. ¶ 154.) Plaintiffs also allege that the Company overvalued trades which resulted in the overstatement of inventory. (*Id.* ¶ 155.)

### 3. *Understatement of allowance for uncollectible accounts*

Plaintiffs allege that Friedman's violated GAAP by "failing to properly set an allowance for uncollectible accounts," in violation of Statement of Financial Accounting Standards 5 ("FASB5"). (Compl. ¶¶ 156–72.) On November 17, 2003, the Company announced: "The principal reason for the restatement is concern over the accounting for the allowance of doubtful accounts." (*Id.* ¶ 108.) Plaintiffs also allege a former Finance Officer of the Southeast Region from 1998 through 2001, stated the allowance for uncollectible accounts was set by corporate accounting, specifically Defendants Stinn, Suglia and Director of Credit Bill Milligan. (*Id.* ¶ 162.)

Plaintiffs further allege a former Friedman's Corporate Controller, employed by Friedman's from 1997 through 1998, stated "that Friedman's 'had no rationale' for setting the reserves for uncollectible accounts and that they were 'made based on how Brad Stinn said it would be.'" (Compl. ¶ 168.) This Corporate Controller had frequent meetings with Defendant Suglia where the allegedly inadequate allowance for uncollectible accounts was discussed. (*Id.* ¶ 170.) The Corporate Controller claims the Company management had frequent arguments with E & Y over the allowance, and that E & Y "knew we were under-reserved." (*Id.* ¶ 171.)

### 4. *Overstatement of inventory*

Plaintiffs allege Friedman's 2001 and 2002 Form 10–K's state the Company values inventory at the lower of weighted average cost or estimated market value. (Compl. ¶ 173.) Plaintiffs claim Defendants failed to value and write down Friedman's inventory in violation of Accounting Research Bulletin 43 ("ARB43"). (*Id.*) Plaintiffs claim a Vice President of Operations and a former jewelry buyer employed by Friedman's until March 2004, stated Friedman's inventory was overstated by thirty to forty million dollars. These former employees detail how Friedman's listed "credit and trade"[12] merchandise as sellable inventory, "notwithstanding the fact that this product remains in the vault and is not shown as product at Friedman's stores." (*Id.* ¶ 174.) Plaintiffs claim a finance officer asserts Friedman's executives "were absolutely aware of the credit and trade problems." (*Id.* ¶ 176.)

### 5. *Understatement of accounts payable as part of alleged scheme to defraud Capital Factors*

Plaintiffs allege the Company "employed a scheme whereby it conspired with Crescent and Cosmopolitan [Gem Corporation] to understate the Company's accounts payable and the related expenses." (Compl. ¶ 179.) Cosmopolitan is a vendor

---

**12.** A product is listed as "credit and trade" merchandise when a customer returns or trades in a product to Friedman's. (Compl. ¶ 174.)

that would sell jewelry to Friedman's on a consignment basis. Cosmopolitan also sold jewelry to Friedman's and Crescent at deep discounts, well in excess of those customary in the industry. (*Id.*) Capital Factors is a company that would lend money to Cosmopolitan based upon the accounts receivable of Cosmopolitan's customers, including Friedman's and Crescent. This loan arrangement obligated Friedman's and Crescent to submit payments for the jewelry to Capital Factors. (*Id.*) Contrary to this obligation, Friedman's would send payments directly to Cosmopolitan, thus overstating the amount Friedman's owed to Capital Factors, resulting in Friedman's deferring payments on consigned goods which Plaintiffs allege induced Capital Factors to lend more money to Cosmopolitan.[13] (*Id.*) Plaintiffs allege Friedman's agreed to the "scheme" because they received "excessive" discounts and credits from Cosmopolitan, and because an officer of Cosmopolitan, Robert Morris, "had a longstanding relationship with Defendants Suglia and Mauro." (*Id.* ¶ 181.) Plaintiffs allege the Company's restatement will include an adjustment to its accounts payable, and both the SEC and Department of Justice (the "DOJ") are inquiring into similar allegations. (*Id.* ¶¶ 180–82.)

### C. Alleged Violations of Securities Laws

Plaintiffs assert five claims against various classes of defendants. In Count I, Plaintiffs assert a claim, on behalf of the class, under Section 10(b) of the Exchange Act against Friedman's, the Individual Defendants and E & Y. Plaintiffs assert claims in Count II under Section 20(a) of the Exchange Act, on behalf of the class,

against the Individual Defendants and Control Person Defendants. In Count III, Plaintiffs assert claims under Section 11 of the Securities Act, on behalf of the Section 11 Subclass, against Friedman's, the Individual Defendants (except Defendants Anderson and Mauro), the Director Defendants, the Underwriter Defendants and E & Y. In Count IV, Plaintiffs assert claims against Friedman's and the Underwriter Defendants (except Defendant ABN), under Section 12(a)(2) of the Securities Act. Finally, in Count V, Plaintiffs assert claims, under Section 15 of the Securities Act, against the Individual Defendants and the Control Person Defendants.

### D. Elements of Plaintiffs' Claims

#### 1. Exchange Act Claims

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security[,] ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe ...." 15 U.S.C. § 78j(b). Rule 10b–5 of the Securities Exchange Commission, promulgated under Section 10(b) of the Exchange Act, makes it unlawful:

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon

---

**13.** The structure of the scheme is not alleged clearly in the Complaint, but the Defendants do not challenge that a questionable arrangement of some sort existed. Furthermore, in Plaintiffs' supplemental submission, submit-

ted on August 29, 2005[156], there is evidence that facts have been developed in the Company's bankruptcy proceeding supporting improper conduct in the relationship involving Capital Factors.

any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1995). To state a securities fraud claim under Rule 10b–5, a plaintiff must demonstrate (1) a misstatement or omission, (2) of a material fact, (3) made with scienter or intent to defraud, (4) in connection with the sale of securities, (5) upon which plaintiff relied, and (6) that proximately caused plaintiff's injury. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir.1999). To satisfy the scienter requirement, "a securities fraud plaintiff must plead scienter with particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner." *Id.* at 1287. "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Theoharous v. Fong*, 256 F.3d 1219, 1224–25 (11th Cir.2001) (quotations and citations omitted).

Section 20(a) provides for "controlling person" liability where an Exchange Act violation is found. 15 U.S.C. § 78t(a). To successfully allege control person liability under Section 20(a), plaintiff must allege that (1) the company violated Section 10(a), (2) the defendant had the power to control the general affairs of the company, and (3) the defendant had the power to control the specific corporate policy that resulted in the primary violation. *See Theoharous*, 256 F.3d at 1227. A defendant is not liable as a control person under Section 20(a) unless a primary violation of the securities laws is proved. *Id.*

2. *Securities Act Claims*

■ In the Eleventh Circuit, liability under Sections 11, 12 and 15 of the Securities Act is described as follows:

Section 11(a) of the 1933 Act, 15 U.S.C. § 77k, provides a cause of action to purchasers of securities where: "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." Section 11 extends liability to every person who signed the registration statement, the issuer's directors, and every underwriter. Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l, imposes liability upon one who sells a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . ." Section 15 of the 1933 Act, 15 U.S.C. § 77o, extends Section 11 and 12 liability to persons who control entities liable under those sections.

*Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188–89 (11th Cir.2002). In summary, to state a claim under Sections 11 and 12 of the Securities Act, a plaintiff must properly allege that he purchased a security issued pursuant to a registration statement, prospectus or oral communication, and that the statement, prospectus or oral communication included a material misrepresentation or omission. These sections do not include a scienter requirement and essentially impose strict liability for material misinformation contained in or omitted from a registration statement or prospectus. *See In re Unicapital Corp. Sec. Litig.*, 149 F.Supp.2d 1353, 1363

(S.D.Fla.2001); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements.").

■ Like Section 20, control person liability under Section 15 is contingent upon a plaintiff proving a primary violation. If plaintiff does not establish a primary violation under the Securities Act, dismissal of his Section 15 claim is warranted.

## II. *DISCUSSION*

Defendants filed eleven motions to dismiss. The Court will address whether Plaintiffs have satisfied the pleading requirements for their claims, whether Plaintiffs have stated a material misstatement or omission necessary to state a securities violation, whether Plaintiffs adequately have pleaded Section 10(b), 11 and 12 claims, and whether Plaintiffs have stated control person claims against Defendants.

### A. *Defendant Friedman's Motion to Dismiss*

Because numerous defendants incorporate aspects of Defendant Friedman's Motion to Dismiss, the Court will address aspects of this motion despite the Notice of Automatic Stay [140], filed on January 24, 2005, staying this case as to Friedman's. That is, the Court is considering those arguments advanced by Friedman's only to the extent the arguments have been adopted by other Defendants. Specifical-

ly, the Court will address whether Plaintiffs adequately plead Section 10, 11 and 12 claims under the applicable pleading requirements, and whether the Complaint sufficiently alleges the misstatement or omission of a material fact.

■ Plaintiffs initially must satisfy the pleading requirements for each of their alleged claims of securities violations. Rule 9(b) and the PSLRA require Plaintiffs to identify the specific statements or omissions alleged to be misleading, articulate the reasons why each statement or omission was misleading, and identify the time, place and context of each allegedly misleading statement. In short, Plaintiffs must set forth the "who, what, when, where, and how" of the Defendants' allegedly fraudulent behavior. *See In re World Access, Inc. Sec. Litig.*, 119 F.Supp.2d 1348, 1353 (N.D.Ga.2000). "[M]erely listing GAAP concepts that were allegedly violated, without explaining how they were violated, fails to meet Rule 9(b)'s particularity requirements." *TAAM Assocs., Inc. v. Housecall Med. Res., Inc.*, No. 1:96–2214, 1998 WL 1745361, at *15 (N.D.Ga. Mar. 30, 1998). These heightened requirements apply to both Plaintiffs' Exchange Act claims and their Securities Act claims that "sound in fraud." *See In re AFC Enters., Inc. Sec. Litig.*, 348 F.Supp.2d 1363, 1376–77 (N.D.Ga.2004) (noting majority rule that Section 11 claims sounding in fraud are subject to the pleading requirements of Rule 9(b)).[14]

■ Whether heightened pleading requirements apply to Plaintiffs' Section 11 and 12 claims depends on whether Plain-

---

**14.** Plaintiffs contest the application of Rule 9(b) to the pleading of Section 11 and 12 claims. This Court will follow the majority rule followed by the District Courts in this Circuit, and apply Rule 9(b)'s requirements to Section 11 and 12 claims that sound in fraud. *See In re AFC Enters., Inc. Sec. Litig.*, 348

F.Supp.2d at 1377; *TAAM Assocs., Inc.*, 1998 WL 1745361, at *11. This position is consistent with Rule 9(b) which requires "all *averments* of fraud" be stated with particularity, and is not limited to instances where fraud is an essential element of a cause of action. *See* Fed.R.Civ.P. 9(b) (emphasis added).

tiffs' claims sound in fraud. A review of Plaintiffs' Complaint and pleadings demonstrates Plaintiffs' claims, including its Securities Act claims, are grounded in allegations of fraud. For example, Plaintiffs allege:

- "Only when the web of deceit and fraud started to unravel did the investing public start to become aware of Defendants' massive and egregious scheme to defraud the public." (Compl.¶ 4.)
- "The massive accounting fraud began to unravel in September 2003." (*Id.*)
- "Friedman's materially false and misleading financial statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding Friedman's actual operating results." (*Id.* ¶ 138.)
- "Defendants issued grossly inflated financial statements, and publicly misrepresented the financial condition and business of Friedman's in order to convey the impression that the Company was profitable." (Pls.' Opp'n to Def. Friedman's Mot. to Dismiss at 4.)
- "Defendants' GAAP violations were not mere errors in judgment, but were actions intended to artificially inflate Friedman's bottom line." (*Id.* at 5.)

Plaintiffs' Complaint, exemplified by these allegations, demonstrates Plaintiffs' claims are premised on fraud. Plaintiffs' Securities Act claims are premised on underlying GAAP violations, which Plaintiffs allege were part of a "web of deceit and fraud" and a "massive accounting fraud," and Rule 9(b)'s pleading requirements apply. This is so even though Plaintiffs state in the Securities Act counts that "Plaintiff Bortel expressly excludes and disclaims

any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this count is based solely on claims of strict liability and/or negligence under the Securities Act." (Compl.¶¶ 334, 346.) Plaintiffs' conclusory disavowal of fraud does not prevent application of Rule 9(b)'s requirements in this case. *See California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160 (3d Cir.2004) (holding Rule 9(b) particularity requirements apply to Section 11 claim, despite one-sentence disavowal of fraud, because "a core theory of fraud permeates the entire Second Amended Complaint and underlies all of Plaintiffs' claims").

■ Plaintiffs, therefore, must plead with particularity false and misleading material statements by Defendants.[15] A court, in reviewing a statement alleged to be an actionable misstatement or omission, must scrutinize the nature of the statement or omission to determine whether the statement was false when it was made. If a complaint fails to plead facts that, if true, would constitute a misrepresentation, and does nothing more than offer the legal conclusion that a representation was somehow misleading, dismissal of plaintiff's claims is appropriate. *Oxford Asset Mgmt., Ltd.*, 297 F.3d at 1193–94. "In other words, if no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law." *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir.2002) (quotation and citation omitted).

■ In addition to being misleading, the alleged misrepresentation or omission must have been material to be actionable

---

**15.** To state a claim under Section 11 or 12 of the Securities Act, or Section 10(b) or Rule 10b–5 of the Exchange Act, a complaint must allege the misstatement or omission of a material fact. *See, e.g., In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n. 10 (3d Cir.1993) (noting materiality requirement is identical under Section 10, Rule 10b–5, Section 11, and Section 12).

under the securities laws. The Eleventh Circuit has held that the materiality element is satisfied if there is a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having "significantly altered the total mix of information made available." *Oxford Asset Mgmt., Ltd.*, 297 F.3d at 1189 (quotation and citation omitted). Put another way, a misstatement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important to an investment decision. *Basic, Inc. v. Levinson*, 485 U.S. 224, 246–47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Conversely, "a fact is immaterial where a reasonable investor could not have been swayed by the misrepresentation." *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d at 897 (quotation and citation omitted).

Plaintiffs allege five categories of GAAP violations that resulted in false statements concerning Friedman's financial results for fiscal years 2000 through 2002, and the first three quarters of 2003. Plaintiffs allege the falsity of the financial results is further evidenced by the Company's announcement it was restating its financial results for these time periods. The focus of Plaintiffs' allegations of false and misleading statements is on the Company's financial results from 2000 through 2003, as set forth in those year's Form 10–K's, quarterly Form 10–Q's, and press releases. (*See* Compl. ¶¶ 33–97.) Plaintiffs contend the financial statements issued by the Company, in violation of GAAP, and incorporated by reference or included in the Registration Statement and Prospectus Supplements, were false and misleading due to the alleged material misstatements of revenues and expenses, and the Company's affirmative statements that the financial statements were prepared in accordance with GAAP. The Court must determine if Plaintiffs allege sufficiently the misstatement of Friedman's financial re-

ports based on the five categories of alleged misconduct.

█ First, Plaintiffs claim the failure to write down Friedman's investment in Crescent caused the Company's financial disclosures to be misleading. However, failure to timely write off impaired assets, in the absence of other facts, is not itself sufficient to state a claim for violation of the securities laws. Defendants further argue Plaintiffs have not alleged when, or why, the Company should have written down its investment in Crescent, and, for these reasons, Plaintiffs' claims based on this conduct should be dismissed.

Plaintiffs have alleged more than simple failure to write down the Company's investment in Crescent. Plaintiffs have identified significant overlapping ownership and executive management between Friedman's and Crescent. This interrelation supports Plaintiffs' assertions that the Company was in a unique position to know at a much earlier time about the impairment in its investment in Crescent.

█ Viewing the allegations in the light most favorable to Plaintiffs, Plaintiffs have identified a significant asset they claim was improperly valued, and they have alleged a sufficient basis to infer the Company was aware of this impairment when representations were made to the Plaintiffs. The Complaint alleges sufficient facts to satisfy the pleading requirements and to identify material misstatements.

Second, Plaintiffs claim Defendants' improper revenue recognition states a claim under the securities laws. Defendant acknowledges the sales made on credit were "risky," but argues that risky sales are not wrongful ones. Plaintiffs, however, do not allege random risky transactions. Instead, they assert a systemic practice by which the Company inflated revenue by booking sales for which they knew payment was

improbable. Plaintiffs also allege specific practices by which Friedman's overstated its trade-in product inventory by thirty to forty million dollars. Plaintiffs claim these allegedly improper revenue practices are supported by statements by a former Regional Partner and former Vice President of Operations. These practices, Plaintiffs assert, caused the Company's financial results to be materially misleading, specifically by misrepresenting sales and revenue streams. Viewing the allegations in the light most favorable to Plaintiffs, Plaintiffs have alleged sufficient facts to meet their pleading responsibilities.

Third, Plaintiffs' allegations regarding allowance for uncollectible accounts are sufficient to state a claim for violation of the securities laws. Plaintiffs contend the principal reason for the restatement is concern over the accounting for the allowance of doubtful accounts. Plaintiffs offer the statements of a former Finance Officer and Corporate Controller to corroborate its allegations that the Company knowingly failed to maintain adequate allowances for uncollectible accounts. Accordingly, Plaintiffs have alleged material GAAP violations that caused the Company's financial statements to be false and misleading.

Fourth, Plaintiffs allege the Company failed to properly value and write down Friedman's inventory. Offering the allegations of a former Vice President of Operations, Plaintiffs have provided particularized explanations regarding the Company's improper treatment of "credit and trade" merchandise, including allegations of the gross dollar amount of the alleged overstatement. This conduct allegedly caused the Company's financial statements during the class period to be false and misleading. The allegations pleaded are sufficient.

Finally, Plaintiffs claim the Company understated its accounts payable as part of a scheme to defraud Capital Factors.

Plaintiffs allege the Company's financial statements require restatement because of this conduct and that the SEC and DOJ are investigating these allegations. While the design and operation of the scheme are pleaded in a superficial way, the general scheme, its references in the Company's bankruptcy court proceedings, and that it is the subject of federal investigations is sufficient to support Plaintiffs' allegation that the Company's financial results were false and misleading as a result of this conduct.

In short, Plaintiffs have identified and pleaded with sufficient particularity five categories of alleged misconduct that resulted in the Company's issuance of allegedly false and misleading financial statements during the class period. Viewing the allegations in the light most favorable to Plaintiffs, Plaintiffs have pleaded the who, what, when, where and how of the alleged misconduct and the resulting misleading statements. *See TAAM Assocs., Inc.,* 1998 WL 1745361, at *9 ("If a defendant states that it complied with GAAP, an allegation that defendant in fact did not do so states an actionable misstatement under the federal securities laws."); *In re Unicapital Corp. Sec. Litig.,* 149 F.Supp.2d at 1364 ("Plaintiff's averments concerning the overvaluation of [the company]'s goodwill sufficiently allege a material misrepresentation that is adequate to support a claim under §§ 11 and 12(a)(2) of the Securities Act."); *In re World Access, Inc. Sec. Litig.,* 119 F.Supp.2d at 1355 (finding improper practices violating GAAP sufficient to state a claim).

### B. *Section 10(b) Claims*

Plaintiffs assert claims for violations of Section 10(b) against the Individual Defendants and E & Y. To state a claim for securities fraud under the Exchange Act, a

plaintiff must, among other requirements, prove scienter, or an intent to defraud.[16]

■ Under the PSLRA, a securities fraud complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Although factual allegations may be aggregated to infer scienter, "scienter must be found with respect to each defendant and with respect to each alleged violation." See Phillips v. Scientific–Atlanta, Inc., 374 F.3d 1015, 1017–18 (11th Cir.2004). "[Section] 10(b) was addressed to practices that involve some element of scienter and cannot be read to impose liability for negligent conduct alone." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 201, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Eleventh Circuit requires that:

> [T]he plaintiff must allege particular facts giving rise to a strong inference that the defendant acted in a severely reckless manner. Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Theoharous, 256 F.3d at 1224–25 (quotations and citations omitted).

■ "[T]o comply with the heightened pleading requirement of the PSLRA, the amended class action complaint must describe how the defendants acted with severe recklessness in relation to the alleged material misrepresentations and omissions." In re Unicapital Corp. Sec. Litig.,

149 F.Supp.2d at 1371. "Since conclusory allegations do not satisfy the pleading requirements of Rule 9(b), the complaint must provide a factual basis for allegations of scienter." In re K–tel Int'l, Inc. Sec. Litig., 300 F.3d at 894 (quotation omitted). Although the PSLRA demands more particularized pleading, the Court on a motion to dismiss must still view all allegations in the light most favorable to the plaintiff. See Fed.R.Civ.P. 12(b)(6).

■ "[A] showing of mere motive and opportunity is insufficient to plead scienter." Bryant, 187 F.3d at 1287. GAAP violations, standing alone, are insufficient to create an inference of fraud. In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 553 (6th Cir.1999); Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1208 (11th Cir. 2001). "[T]o plead fraudulent accounting practices with particularity, a complaint should show facts that support the inference that the defendants recklessly disregarded the deviance from GAAP or acted with gross indifference to the misrepresentations in its financial statements. Relevant facts are the magnitude of the accounting error, whether the defendants had prior notice of the error, and whether the defendants played any role in calculating and disseminating the financial statement." In re Scientific–Atlanta, Inc. Sec. Litig., 239 F.Supp.2d 1351, 1366 (N.D.Ga. 2002) (quotation omitted). "Thus, in certain circumstances, courts have held that allegations of violations of GAAP, coupled with ignoring 'red flags' or warning signs of improprieties, can be sufficient to state a claim of securities fraud." In re Smith Gardner Sec. Litig., 214 F.Supp.2d 1291, 1302 (S.D.Fla.2002). "The issuance of a restatement may also contribute to the establishment of scienter. Where the number, size, timing, nature, frequency, and context of the GAAP violations or restatement are taken into account, the

---

**16.** Scienter is not required to allege a violation of the Securities Act.

balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter." *In re AFC Enters., Inc. Sec. Litig.*, 348 F.Supp.2d at 1372.

Because Plaintiffs must allege each Defendant acted with scienter, the Court will consider the allegations against each Defendant against whom Plaintiffs assert Section 10(b) claims.

### 1. *Individual Defendants*

#### a. *Defendant Stinn*

■ Plaintiffs bring claims against Defendant Stinn, the Company's Chief Executive Officer, under Sections 10(b) and 20(a) of the Exchange Act and Sections 11 and 15 of the Securities Act. Defendant Stinn argues the Section 10(b) claims against him must be dismissed because Plaintiffs have failed to plead sufficient facts that he acted with scienter.

Plaintiffs must allege facts giving rise to a strong inference that Defendant Stinn acted intentionally, or in a severely reckless manner, in making the statements alleged to have been fraudulent. The Complaint alleges significant and numerous GAAP violations which caused the Company's financial reports, signed by Defendant Stinn, to be restated. Plaintiffs claim the size of the restatement and the number of accounting violations underlying the restatement indicate severe recklessness. Plaintiffs note his role as Cres-

cent's CEO, that he necessarily must have been aware of Crescent's financial condition and thus was aware of the alleged failure to write down the Company's investment in Crescent in violation of GAAP. (Compl.¶ 139.) Plaintiffs also detail Defendant Stinn's extensive involvement in the day-to-day operations of the Company, including discussions involving accounts receivable, (*id.* ¶ 265), and uncollectible accounts. (*Id.* ¶¶ 212, 270.) That Defendant Stinn was the senior Company official during the time when the alleged systemic and pervasive accounting fraud was occurring is indicative of scienter. When combined with Plaintiffs' specific allegations of his knowledge of the alleged true state of the Company's finances, Plaintiffs have alleged sufficient facts at this stage of the proceedings to allege Defendant Stinn possessed knowledge, or was severely reckless in not knowing, that the Company's financial statements were materially false and misleading when issued.

#### b. *Defendant Mauro*

■ Defendant Mauro was Friedman's and Crescent's Controller at all relevant times. (Compl.¶ 12(e).) Plaintiffs assert claims against Defendant Mauro under Section 15 of the Securities Act and under Sections 10(b) and 20 of the Exchange Act. Defendant Mauro claims Plaintiffs have failed to plead scienter.[17] Plaintiffs allege

---

**17.** Defendant Mauro argues the claims against him depend upon the group pleading doctrine and that this doctrine is no longer viable. Because Plaintiffs cannot allege specific facts tying him to each of the alleged misrepresentations, and Defendant Mauro did not sign the allegedly false statements, Defendant Mauro argues Plaintiffs have failed to state a claim against him. The Eleventh Circuit has not definitively ruled on the continuing viability of the group pleading doctrine after the enactment of the PSLRA. The Court assumes that the doctrine applies and Plaintiffs have pleaded claims against Defendant Mauro. *See In re AFC Enters., Inc. Sec. Litig.*,

348 F.Supp.2d at 1371 (finding group pleading doctrine remains viable in appropriate circumstances). Application of the doctrine is particularly fair and appropriate in this case in which the alleged misrepresentations concern accounting manipulations and Defendant Mauro was the Controller of the Company; he was necessarily involved with the corporate practices at issue and the creation of the statements in the financial disclosures. *See Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir.2004) (finding statements in corporate documents may be charged to corporate officer provided

the following indicia of Defendant's knowledge of the fraudulent conduct alleged: (1) the Company committed numerous GAAP violation based on accounting methods, (Compl.¶ 35), (2) Mauro helped set the allowance for uncollectible accounts, (*id.* ¶ 162), (3) Mauro reviewed "Error Reports" which disclosed the scope of the bad credit involved, (*id.*), and (4) Mauro was "at the center of scheme" involving Crescent, Cosmopolitan and Capital Factors. (*Id.* ¶¶ 179, 181; Pls.' Opp'n to Def. Mauro's Mot. to Dismiss at 7.) Plaintiffs further allege Defendant Mauro had access to meaningful internal reports, including financial ones, regarding the Company's "true financial condition." (Compl. ¶ 269; Pls.' Opp'n to Def. Mauro's Mot. to Dismiss at 8.) Plaintiffs also claim Defendant Mauro's position as Controller, in which he was integrally involved in running the accounting functions of the Company, demonstrates his knowledge of adverse facts affecting important segments of the business. (Pls.' Opp'n to Def. Mauro's Mot. to Dismiss at 10.) *See In re Towne Services, Inc. Sec. Litig.*, 184 F.Supp.2d 1308, 1325 (N.D.Ga.2001); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 490 (S.D.N.Y.2004) (imputing knowledge of facts relating to core operations of company to company's key officers).

The Court finds Plaintiffs have pleaded facts sufficient to give rise to a strong inference Defendant Mauro acted intentionally, or in a severely reckless manner. At the heart of Plaintiffs' claims are accounting manipulations and collusive conduct between Friedman's and Crescent. Defendant Mauro's position as Controller at both companies, when combined with his alleged knowledge of the Company's true financial condition and involvement in

the alleged practices at issue here, are sufficient for the Section 10(b) claims against him to survive the motion to dismiss.

c. *Defendant Anderson*

██ Defendant Anderson was the Company's Chief Operating Officer ("COO") from September 2001 through June 2004. Plaintiffs assert claims against Defendant Anderson under Section 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act. Defendant moves to dismiss Plaintiffs' claims on the grounds Plaintiffs have failed adequately to plead scienter.

To state a claim against Defendant Anderson, Plaintiffs must allege particular facts giving rise to a strong inference that Defendant acted intentionally or with severe recklessness. Plaintiffs allege the following facts as to Defendant Anderson as evidence of his scienter: (1) he was COO between September 2001 and January 2004; (2) he implemented Friedman's collection process guidelines (Compl.¶¶ 165–66); (3) Defendant Anderson participated in meetings and received reports addressing Friedman's operations, including uncollectible customer accounts (*id.* ¶¶ 264–65); (4) his alleged efforts to increase sales (*id.* ¶ 253); (5) statements in a May 5, 2004 Form 8–K attributed to him, regarding corporate events (*id.* ¶ 123); (6) statements in a February 27, 2004 press release, in which he expressed opinions on the performance of the Company (*id.* ¶ 115); (7) he resigned in June 2004; and (8) his receipt of over $160,000 in incentive-based compensation and $150,000 in stock options. (*Id.* ¶¶ 288, 291.) Plaintiffs also claim where "a defendant 'was inte-

the officer is linked to the statement by "explaining the individual's involvement in the formulation of" the statement). Furthermore, the Court finds the allegations of Defendant

Mauro's knowledge in his individual capacity are sufficiently pleaded to allege his scienter with respect to each of the five categories of the violations alleged.

grally involved in running [the company] and evaluating the financial condition of the company,' scienter is sufficiently alleged," particularly where a core operation of the Company is involved. (Pls.' Opp'n to Def. Anderson's Mot. to Dismiss at 15–17) (quoting *Zuckerman v. Smart Choice Auto. Group, Inc.,* No. 99–cv–237, 2000 WL 33996254, at *2, 2000 U.S. Dist. LEXIS 13489, at *5–6 (M.D.Fla. May 18, 2000).)

It is unclear whether Defendant Anderson's role as COO, his implementation of collection process policies, and his participation in meetings at which the Company's performance was discussed support an inference of scienter. Plaintiffs' claims are not based on the practices themselves; rather, Plaintiffs' claims are based on the accounting treatment of those practices. However, one who functions as the chief operating officer of a national company and serves as one of the core members of the senior management group necessarily is provided significant information, formally and informally, about the financial performance, or failure of performance, over which he has overall operational responsibility. Even though Defendant Anderson is not alleged to have been involved in the Company's financial disclosures or the accounting decisions underlying them, which form the crux of Plaintiffs' Complaint, he was in a position to review and scrutinize them. Ordinarily, this is a responsibility of the senior managers of a company. That he was from time to time

responsible for making statements that appeared in press releases and SEC filings, such as the February 2004 press release and May 2004 Form 8–K, confirm his overall participation in, and responsibility for, management of the Company.

The question is whether this is sufficient to find scienter. The law requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). A showing of "motive and opportunity" is not enough. *Bryant,* 187 F.3d at 1287. If there are sufficient facts to support a finding of scienter, they have not been alleged here. Having carefully evaluated the claims alleged, the Court ultimately concludes Plaintiffs have not sufficiently pleaded a Section 10(b) claim against Defendant Anderson, although admittedly this is a very close call.[18]

#### 2. *Defendant E & Y*

■ Plaintiffs' claims against Defendant E & Y[19], for violations of Sections 10(b) and 11, are based on E & Y's representations that Friedman's financial statements for fiscal years 2000, 2001 and 2002 conformed with GAAP, and that E & Y's audits were performed in accordance with Generally Accepted Auditing Standards ("GAAS").[20] (Compl.¶¶ 192, 194, 199.) Plaintiffs further allege E & Y's statements were incorporated into the Company's Registration Statement and Prospec-

---

**18.** Although the Court assumes the continuing viability of the group pleading doctrine for purposes of pleading with particularity violations of the securities laws, "[i]t is important to note that the group pleading doctrine ... has no application to the determination of scienter as to individual defendants." *In re AFC Enters., Inc. Sec. Litig.,* 348 F.Supp.2d at 1371.

**19.** Defendant requests the Court strike a portion of paragraph 16 of the Complaint be-

cause it is immaterial and involves "a completely different matter." (Def. E & Y's Mot. to Dismiss at 8 n. 5.) The Court denies Defendant's request at this time.

**20.** GAAS "are the standards prescribed by the Auditing Standards Board of the American Institute of Certified Public Accountants ("AICPA") for the conduct of auditors in the performance of an examination." *Ziemba,* 256 F.3d at 1200 n. 3.

tus Supplements. (*Id.* ¶¶ 196, 198, 201, 203.) On November 17, 2003, E & Y withdrew its audit opinions for 2000, 2001, and 2002, and E & Y resigned as Crescent's auditor on May 15, 2004. (*Id.* ¶¶ 108, 118.)

Plaintiffs claim E & Y did not comply with GAAS in auditing the Company.[21] (Compl.¶¶ 208, 218, 219, 220, 223, 226.) According to Defendant E & Y, Plaintiffs fail to allege sufficient facts demonstrating E & Y acted with scienter, and, therefore, Plaintiffs' Section 10(b) claim against it must be dismissed.[22] Plaintiffs focus their allegations of scienter on: (1) alleged arguments E & Y had with Friedman's management about allowances for uncollectible accounts, as detailed by a former Corporate Controller of Friedman's, (Compl.¶ 171); (2) the interrelationship between E & Y, Friedman's and Crescent during the class period, indicating E & Y should have known of the impairment of Friedman's investment in Crescent; (3) the magnitude of the restatement; and (4) the number of GAAP and GAAS violations. (Pls.' Opp'n to Def. E & Y's Mot. to Dismiss at 14–20.)

■ Plaintiffs must allege sufficient facts to give rise to a strong inference Defendant acted intentionally or with se-

vere recklessness. To allege scienter against an auditor, "an alleged failure to comply with auditing principles must be supported by specific factual allegations which support a strong inference that the audit was so deficient that it amounted to no audit at all." *In re Sunterra Corp. Sec. Litig.*, 199 F.Supp.2d 1308, 1337 (M.D.Fla. 2002).[23]

Here, Plaintiffs present statements by a former Corporate Controller who was employed with Friedman's from 1997 through 1998 and reported directly to Defendant Suglia. (Compl.¶ 168.) Plaintiffs allege:

> [T]he Corporate Controller stated that Company management "had continuous arguments with E & Y," over the allowance for uncollectible accounts. The Corporate Controller recalls that E & Y "knew we were under-reserved." As a result, the E & Y Jacksonville, Florida office had discussions with Defendants Stinn and Suglia about the issue every quarter. Specifically E & Y put together a "list of discussion items" every quarter and the reserves for doubtful accounts was "always on the list." Each quarter during the Class Period, E & Y reviewed the Company's financial statements for that quarter.

---

21. The class period runs from January 26, 2000 through August 20, 2004, but E & Y made its first alleged misrepresentation in the audit report in Friedman's Form 10–K filed on December 28, 2000. Additionally, E & Y announced on November 17, 2003, that E & Y was withdrawing its audit reports and that Friedman's was going to restate those financial statements. Defendant claims it cannot be liable for stock purchases before it made its first alleged misrepresentation or after it announced the withdrawal of its reports.

22. Defendant moves the Court to dismiss Plaintiffs' Complaint because it is an impermissible "shotgun pleading" directed at nineteen defendants, all having different capacities and playing different roles. (Def. E & Y's

Mot. to Dismiss at 6–9.) In light of the complexity of the allegations and Plaintiffs' obligation to plead its claims with particularity— a separate ground on which Defendant urges Plaintiffs' Complaint be dismissed—the Court finds Plaintiffs' Complaint is not a "shotgun pleading" which should be dismissed.

23. The parties dispute the standard of review applied in securities cases on a motion to dismiss. Defendant contends Plaintiffs are entitled only to the most plausible inferences, while Plaintiffs contend they are entitled to any reasonable inference. The Court is not required to resolve this dispute in deciding the issues before it. The Court's findings would be the same using either standard.

(*Id.* ¶ 171.) Defendant contends these allegations are not sufficiently detailed, simply reflect that E & Y was doing its job by discussing potential problems with the Company, and do not demonstrate knowledge during 2000, 2001 and 2002, the periods at issue in this case. (Def. E & Y's Reply Br. at 5.)

The Court disagrees. Plaintiffs allege Defendant E & Y knew of accounting problems at the Company regarding uncollectible accounts, specifically identifying the E & Y office, accounting violation, and Friedman's officers at issue. That these allegations concern conduct occurring before the class period is not fatal to Plaintiffs' claims. When combined with Plaintiffs' allegations of significant and numerous GAAP and GAAS violations in relation to the Company's treatment of uncollectible accounts, which, are partly responsible for the restatement of previous financial statements, Plaintiffs raise a strong inference of scienter to survive Defendant E & Y's motion to dismiss. *See In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1344–45 (S.D.Fla.1999); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir.2002) ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."). However, Plaintiffs have not pleaded with the required particularity facts sufficient to infer, or even suggest, scienter with respect to other GAAP violations alleged. Accordingly, Section 10(b) claims based on conduct unrelated to the uncollectible accounts allegations, are required to be dismissed because Plaintiffs have not demonstrated scienter in regards to other alleged misconduct.[24]

### C. *Section 11 and 12 Claims*

Plaintiffs assert claims against the Individual Defendants, except for Defendants Anderson and Mauro, the Director Defendants, the Underwriter Defendants and E & Y, for violations of Section 11. Plaintiffs assert claims against the Underwriter Defendants, except Defendant ABN, for violations of Section 12. To state a claim under Sections 11 and 12 of the Securities Act, a plaintiff must properly allege that he purchased a security issued pursuant to a registration statement, prospectus or oral communication, and that the statement, prospectus or oral communication included a material misrepresentation or omission. Those liable for the misleading statement under Section 11 include every person who signed the registration statement, every accountant who has prepared or certified any part of the registration statement, and every underwriter with respect to the securities purchased by plaintiff. 15 U.S.C. § 77k. Those liable under Section 12 include only those who offer or sell securities pursuant to a misleading statement.

#### 1. *Underwriter Defendants*

 The Underwriter Defendants assert the Securities Act claims brought

---

**24.** Plaintiffs claim E & Y's relationships with Friedman's and Crescent evidence scienter. Plaintiffs, however, do not demonstrate how E & Y's status as auditor of both companies establishes the strong inference of scienter required. (*See* Pls.' Opp'n to Def. E & Y's Mot. to Dismiss at 20–21; Compl. ¶¶ 118, 134.) This *ipso facto* reasoning would relieve a Court from performing the disciplined scienter analysis required by the Exchange Act. Similarly, Plaintiffs state "The Crescent/Friedman's scheme involving Cosmopolitan was undoubtedly a 'red flag' that E & Y would have had to have been severely reckless to ignore." (Pls.' Opp'n to Def. E & Y's Mot. to Dismiss at 21.) This conclusory assertion does not demonstrate that E & Y had knowledge, or why it was severely reckless in not knowing, about the "scheme," and does not establish a strong scienter inference.

against them in connection with Friedman's secondary stock offerings on February 6, 2002 and September 19, 2003, should be dismissed because Plaintiffs fail to satisfy their obligation under Rule 9(b) to plead their claims with particularity. The only claims against the Underwriter Defendants arise from their role as underwriters for the 2002 and 2003 public offerings; Plaintiffs do not allege these Defendants knew of the alleged fraud or were severely reckless in not knowing about it. Defendants claim Plaintiffs make "only a handful of references to the Underwriter Defendants," and "do not specify any facts describing a single negligent act or failure to act." (Underwriter Defs.' Mot. to Dismiss at 14–15.) The Court has found Plaintiffs' Section 11 and 12 claims sound in fraud and Rule 9(b) applies. However, while Rule 9(b) requires the circumstances of the fraud be pleaded with particularity, it does not require scienter to plead Section 11 and 12 claims against the Underwriters Defendants. *See TAAM Assocs., Inc.,* 1998 WL 1745361, at *10 ("Neither § 11 nor § 12(2) require that a plaintiff prove scienter to hold a defendant liable for an alleged misrepresentation in a registration statement."); *In re Healthsouth Corp. Sec. Litig.,* No. 98–2634, 2000 WL 34211319, at *19 (N.D.Ala. Dec. 13, 2000) ("Because the same policy considerations apply to Section 11 claims sounding in fraud, we hold that persons making such claims must state with particularity the circumstances constituting the alleged fraud."). To state a claim under Sections 11 and 12 of the Securities Act, a plaintiff must properly allege that he purchased a security issued pursuant to a registration statement, prospectus or oral communication, and that the statement, prospectus or oral communication included a material misrepresentation or omission. Both theories of liability extend to the underwriters of an offering. As discussed previously, Plaintiffs allege sufficient facts to demon-

strate the registration statements and prospectus supplements contained materially misleading information. While Plaintiffs do not claim Defendant Underwriters acted fraudulently or negligently, that is not necessary to state a claim under the Securities Act. Plaintiffs have pleaded sufficient facts to state claims against the Underwriter Defendants.

■ The Underwriter Defendants also claim Plaintiffs' Section 12(a)(2) claim should be dismissed because Plaintiffs lack standing. Only purchasers of stock in initial distributions to the public have standing to bring suit under Section 12(a)(2). *First Union Disc. Brokerage Services, Inc. v. Milos,* 997 F.2d 835, 843–44 (11th Cir. 1993) ("[S]ection 12(2) of the 1933 Act does not apply to aftermarket transactions."). To have standing to bring the Section 12(a)(2) claims, Plaintiffs must establish they purchased stock directly from the Underwriter Defendants in the initial offerings.

■ Plaintiffs do not assert a Section 12(a)(2) claim for the alleged purchase of securities in connection with the February 2002 offering. Instead, in Count IV of the Complaint, Plaintiffs assert a claim against the Underwriter Defendants under Section 12(a)(2) for shares purchased pursuant to the September 19, 2003 offering. Plaintiffs allege "Plaintiff Bortel and other members of the Section 12(a)(2) Subclass purchased or otherwise acquired Friedman's shares pursuant to the defective Registration Statement and September 19, 2003 Prospectus." (Compl.¶ 351.) Plaintiffs claim Plaintiff Bortel purchased 1,000 shares of stock on September 19, 2003, the day of the offering, for fifteen dollars per share—the offering price. (Pls.' Opp'n to Underwriter Defs.' Mot. to Dismiss at 19.) Defendants claim Plaintiffs do not allege Plaintiff Bortel purchased shares in the offering directly from the Underwriter De-

fendants. Failure to do so, they claim, requires dismissal of Plaintiffs' Section 12 claim. (Underwriter Defs.' Reply Br. at 11.) Viewing the allegations in the light most favorable to Plaintiffs, the Court finds the allegations that Plaintiffs purchased stock on the date of the offering at the offering price is sufficient at this stage to establish that Plaintiff Bortel purchased in the offering and thus has standing to pursue Plaintiffs' Section 12(a)(2) claims. The Underwriter Defendants may challenge Plaintiffs' standing at a later stage in the proceedings should discovery disclose information inconsistent with Plaintiffs' alleged standing.

### 2. *Outside Director Defendants*

Plaintiffs assert a claim under Section 11 against the Outside Director Defendants based solely on the fact they signed the Registration Statement and Prospectus Supplements filed by Friedman's.

■ To state a Section 11 claim, Plaintiffs must properly allege they purchased a security issued pursuant to a registration statement, prospectus or oral communication, and that the statement, prospectus or oral communication included a material misrepresentation or omission. Section 11 extends liability to every person who signed the registration statement, the issuer's directors, and every underwriter. The statute provides the following defense for non-issuer defendants:

> Notwithstanding the provisions of subsection (a) of this section no person, other than the issuer, shall be liable as provided therein who shall sustain the burden of proof—... (A) as regards any part of the registration statement not purporting to be made on the authority of an expert, ... he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements

therein were true ...; and (C) as regards any part of the registration statement purporting to be made upon the authority of an expert ... he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue ....

15 U.S.C. § 77k(b). In short, with respect to "non-expertised" portions of a registration statement or prospectus, to establish the statutory defense a defendant must demonstrate due diligence in making a reasonable investigation. With respect to "expertised" portions of such documents, defendant need only establish he reasonably relied on the expert. The standard of reasonableness a defendant must establish is "that required of a prudent man in the management of his own property." 15 U.S.C. § 77k(c).

■ The Outside Director Defendants claim Plaintiffs' claims against them must be dismissed because the Section 11 affirmative defense is established on the face of the Complaint. Defendants contend Plaintiffs' allegations that E & Y purported to issue its opinions in conformance with GAAP and GAAS, yet failed in its role as auditor, establish Defendants' affirmative defense. Defendants thus contend "it is clear from the face of the Complaint that the Outside Director Defendants had no reasonable ground to believe, and did not believe, at the time the Registration Statement became effective, that the statements therein were untrue ...." (Outside Director Defs.' Mot. to Dismiss at 11–12.)

The Outside Director Defendants are non-issuer defendants who may assert the statutory affirmative defense. The Outside Director Defendants essentially concede Plaintiffs have established the *prima facie* case for Section 11 liability against the Outside Director Defendants but rely

on the affirmative defense that they reasonably relied on Defendant E & Y's expert opinions in signing the allegedly false and misleading statements.[25] Congress expressly required a defendant to "sustain the burden of proof" to establish the reasonableness of their actions, both in exercising due diligence with respect to non-expertised portions of the registration statements and in relying on Defendant E & Y's opinions in those portions which were expertised. 15 U.S.C. § 77k(b); *In re Enron Corp.*, 258 F.Supp.2d 576, 639 (S.D.Tex.2003) (holding the statute "expressly places the burden on Defendants").

Having reviewed the Complaint, the Court cannot determine now, as a matter of law, that Defendants have established the statutory affirmative defense. Plaintiffs claim several of the Outside Director Defendants were intimately involved with the Company's operations and that Defendants did not make reasonable investigation nor reasonably rely on Defendant E & Y's opinions.[26] (Pls.' Opp'n to Outside Director Defs.' Mot. to Dismiss at 16–17.) Based solely on the Complaint, and viewing the allegations in the light most favorable to Plaintiffs, Defendants have not established the Section 11 statutory defense of due diligence or reasonable reliance on an expert's opinion.[27] "As determinations of the reasonableness of a defendant's investigation or a defendant's reliance on expert opinion are fact-intensive inquiries, they are generally not properly resolved on motions to dismiss." *AFC Enters., Inc. Sec. Litig.*, 348 F.Supp.2d at 1380 (holding summary judgment may be appropriate time to determine reasonableness of director and underwriter defendants' reliance on expert's opinions); *see also In re*

---

**25.** In addition to relying on the due diligence affirmative defense, Plaintiffs also incorporate Defendant Friedman's motion to dismiss.

**26.** Defendants contend the Outside Director Defendants' duty was necessarily lower than the duty imposed on inside directors. (Outside Director Defs.' Reply at 8–10.) Defendants cite *Goldstein v. Alodex Corp.*, 409 F.Supp. 1201, 1203 n. 1 (E.D.Pa.1976), for the proposition that an inside director with intimate knowledge of corporate affairs is expected to make a more thorough investigation than is an outside director, "although each must undertake that investigation which a reasonable prudent man in that position would conduct." (Outside Director Defs.' Reply at 10 (quoting *Goldstein*, 409 F.Supp. at 1203 n. 1).) Plaintiffs contest this distinction, and further contest the Outside Director Defendants were actually outsiders. The Court agrees with Defendants and the *Goldstein* court that there is a distinction between the duty imposed on inside and outside directors, although the distinction is not binary and can vary from one director to another by virtue of the director's involvement with Company affairs and access to information. *See* 15 U.S.C. § 77k(3) (requiring "reasonable investigation" and that individual has "reasonable ground to believe and did believe" there were no misstatements). Although this distinction

based on "reasonableness" is supported by the statute, it also demonstrates the fact-intensive nature of the Court's evaluation of the statutory affirmative defense.

**27.** Defendants note that most of their cited cases involving the Section 11 defense were decided on summary judgment, but suggest the reasoning is applicable here because Plaintiffs' Complaint does not establish Defendants had reasonable grounds to question the accuracy of the Company's financial statements. (Outside Director Defs.' Mot. to Dismiss at 6 n. 11.) It is Defendants' burden, however, to establish the reasonableness of their actions and they cannot do so here on the basis of Plaintiffs' Complaint. Defendants cite *Quiller v. Barclays American/Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir.1984), for the proposition that affirmative defenses can be decided properly on a motion to dismiss. The *Quiller* Court held that defenses such as res judicata, statute of limitations and federal preemption of state claims can be properly adjudicated on a motion to dismiss, "so long as the defense clearly appears on the face of the complaint." *Id.* at 1069. There currently are insufficient facts to conduct the fact-intensive inquiry required.

*Enron Corp.,* 258 F.Supp.2d at 639 ("Nor is the fact-specific determination of 'the reasonableness' of a defendant's investigation or of his reliance on the opinion of an expert 'a question properly resolved on a motion to dismiss.'") (quoting *Griffin v. PaineWebber Inc.,* 84 F.Supp.2d 508, 513 (S.D.N.Y.2000)). Plaintiffs' claims, therefore, survive the Outside Director Defendants' Motion to Dismiss.

### 3. *Defendant Brinkley*

■ Plaintiffs assert claims under Section 11 against Defendant Brinkley, based on the fact he was the Chairman of the Board of Directors at the Company from the start of the class period until December 23, 2003, signed the 2001 Form 10–K and 2002 Form 10–K, and received compensation and benefits from Friedman's for his services. (Compl.¶¶ 14(a), 62, 78, 288, 290, 293.) Defendant claims Plaintiffs "have failed to allege *any* facts detailing Mr. Brinkley's supposed involvement in the alleged scheme." (Def. Brinkley's Mot. to Dismiss at 16.) Because Plaintiffs have not sufficiently alleged Defendant Brinkley's involvement with or knowledge of the allege fraud, Defendant Brinkley argues the claims against him must be dismissed.

The Court has found that Plaintiffs' Section 11 claims must comply with Rule 9(b). However, requiring Plaintiffs to plead the circumstances of the fraud with particularity does not impose on Plaintiffs an obligation to plead scienter against Defendant Brinkley to establish a Section 11 claim. Instead, Plaintiffs must plead the circumstances of the alleged fraud with particularity, but, as to Defendant Brinkley, they simply must satisfy the Eleventh Circuit's test for imposing Section 11 liability. Plaintiffs, therefore, must allege they purchased securities issued pursuant to a registration statement, prospectus or oral communication, and that the statement, prospectus or oral communication included a material misrepresentation or omission. Section 11 extends liability to every person signing the registration statement.

Because the Court has found Plaintiffs purchased securities pursuant to a Registration Statement and Prospectus Supplements which were alleged to be materially misleading, and Plaintiffs have satisfied Rule 9(b)'s requirements as to the circumstances of the underlying fraudulent conduct, the fact that Defendant Brinkley signed the 2001 and 2002 Form 10–K's establishes Plaintiffs have met their pleading obligations to prove a Section 11 claim against Defendant Brinkley.

### 4. *Defendant ABN*

Plaintiffs assert a claim under Section 11 of the Securities Act against ABN. Plaintiffs' claim is based on ABN's role as an underwriter of the February 2002 offering pursuant to a shelf Registration Statement filed by Friedman's on December 28, 2001, and a Prospectus Supplement containing allegedly false and misleading financial statements which was filed on February 6, 2002. Defendant ABN argues Plaintiffs' claims against ABN should be dismissed because: (1) Plaintiffs did not suffer injury because Plaintiff Bortel profited from his sale of Friedman's securities; (2) Plaintiff Bortel does not have standing because he did not purchase in the February 2002 offering and cannot trace his purchases to this offering; (3) Plaintiffs have failed to plead reliance on the Registration Statement; and (4) Plaintiffs fail to plead fraud with the particularity required by Rule 9(b).

Plaintiffs admit Defendant ABN's "liability is premised solely upon its participation in the February 2002 secondary offering in which it participated." (Pls.' Opp'n to Def. ABN's Mot. to Dismiss at 5.) Plaintiffs essentially concede Plaintiff Bortel's purchases of securities on September

19 and 22, 2003, were made pursuant to the September 2003 secondary offering and not the February 2002 offering underwritten by ABN. Plaintiffs contend they may assert claims based on the February 2002 offering because the shares of Friedman's stock in both the February 2002 and September 2003 secondary offerings "originated from the same Shelf Registration Statement that Friedman's filed on December 28, 2001." (Pls.' Opp'n to Def. ABN's Mot. to Dismiss at 10.) Plaintiffs allege "[t]he fact that the same registration statement was used to issue shares in both secondary offerings grants Plaintiff Bortel standing to assert Section 11 claims in connection with those offerings." (*Id.* at 11.) Defendant ABN contends the two offerings had separate prospectuses, were separately underwritten, and, therefore, Plaintiffs do not have standing to sue ABN.

■■■ Section 11 imposes civil liability for public offering of securities pursuant to a false registration statement, and permits a person "acquiring such security" to sue "every underwriter with respect to such security." 15 U.S.C. § 77k(a). "While Section 11's liability provisions are expansive—creating virtually absolute liability for corporate issuers for even innocent material misstatements—its standing provisions limit putative plaintiffs to the narrow class of persons consisting of those who purchase securities that are the direct subject of the prospectus and registration statement." *Krim v. pcOrder.com. Inc.*, 402 F.3d 489, 495 (5th Cir.2005). Section 11 does not require the securities be purchased directly in the offering[28]; rather, "to have standing under section 11, one must simply be able to trace the purchase of his securities to the registration statement that allegedly violated section 11 by containing a material misrepresentation or omission." *In re JDN Realty Corp. Sec. Litig.*, 182 F.Supp.2d at 1244.

Plaintiffs' standing, therefore, depends on whether it can trace the purchase of securities to the offering underwritten by Defendant. Plaintiffs admit their purchase of securities was pursuant to the September 2003 offering, and not the February 2002 offering underwritten by Defendant ABN. The statute provides "any person acquiring *such security*" may sue "every underwriter *with respect to such security.*" 15 U.S.C. § 77k(a) (emphasis added). The clear import of the statute is that Plaintiffs may only sue the underwriter of the offering to which they trace their shares. That both offerings originated from the same 2001 Shelf Registration Statement is not determinative. *See In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F.Supp.2d 152, 158–59 (D.Mass.2004) (holding plaintiff has standing to pursue Section 11 claims against underwriter only for stock traceable to the specific offering). Because Plaintiff Bortel's purchases are traceable only to the September 2003 offering, Plaintiffs do not have standing to

---

**28.** Defendant contends Plaintiffs must have purchased securities in the offering itself, rather than simply being able to trace the purchase to the registration statement, to have standing to pursue Section 11 claims. (Def. ABN's Mot. to Dismiss at 10–13.) In *In re JDN Realty Corp. Sec. Litig.*, 182 F.Supp.2d 1230, 1244 (N.D.Ga.2002), this Court considered, and rejected, Defendant's argument. The Court examined the statutory language and noted the statute allows "any person acquiring such security" to bring suit. *Id.* at 1244; 15 U.S.C. § 77k(a). "Thus, to have standing under section 11, one must simply be able to trace the purchase of his securities to the registration statement that allegedly violated section 11 by containing a material misrepresentation or omission." *Id.* Defendant's argument requiring actual purchase in the offering is not supported by the statute or relevant case law, and the Court agrees with the reasoning of *In re JDN Realty Corp. Sec. Litig.*, requiring only that the purchase be traceable to the allegedly misleading registration statement.

sue Defendant ABN in its role as underwriter of the February 2002 offering of Company stock, and the allegations against ABN are insufficient.[29]

### 5. *Defendant E & Y*

Defendant E & Y contends Plaintiff Bortel's certification shows he sold his Friedman's stock more than a month before the November 17, 2003 announcement disclosing E & Y's withdrawal of its allegedly false audit reports, and, therefore, the stock price decline was not caused by E & Y's alleged misrepresentations. (Def. E & Y's Mot. to Dismiss at 22.) Defendant E & Y claims further that Plaintiffs' Section 11 claims stemming from the February 6, 2002 offering should be dismissed because Plaintiff Bortel profited from his acquisition of those securities and the price he received for the sale of those securities exceeded the offering price. The offering price was $9.50 per share, (Compl.¶ 326), Plaintiff Bortel purchased 7500 shares on June 4, 2003 at $11.75, and he sold all of his shares on October 13, 2003, for $12.30.

Plaintiffs respond by arguing Plaintiff Bortel's Section 11 claims are based on shares purchased on September 19, 2003, at $15.00 per share. Thus, Plaintiff Bortel did suffer loss when he sold for $12.30 on October 13, 2003. (Pls.' Opp'n to Def. E & Y's Mot. to Dismiss at 23.)

■ The Court finds Plaintiff Bortel has sufficiently alleged loss causation. Plaintiffs allege Friedman's announced on October 2, 2003, that the DOJ had notified the Company on September 29, 2003, it was conducting an investigation into the Capital Factors scheme. (Compl.¶ 99.)

This announcement caused a drop in the Company's stock price before Plaintiff Bortel sold the shares he purchased for $15.00 per share on September 19, 2003, thus sufficiently establishing Plaintiffs' loss causation. That Plaintiff Bortel sold shares before E & Y's alleged misrepresentations were revealed on November 17, 2003, is not relevant to determining its potential liability under Section 11. E & Y's Section 11 liability is premised upon its role as an accountant certifying allegedly false Registration Statements and Prospectuses, and Plaintiffs have sufficiently pleaded this claim against E & Y. *See* 15 U.S.C. § 77k(a)(4).

■ The Court also finds Plaintiffs have standing to pursue Section 11 claims against E & Y arising from the February 6, 2002 offering and the September 19, 2003 offering. The parties agree Plaintiff Bortel's standing to bring Section 11 claims stems from his purchase of shares from the September 2003 offering, and they agree that Plaintiff Bortel did not purchase shares from the February 2002 offering. Plaintiffs claim Plaintiff Bortel has standing to bring claims against E & Y on behalf of purchasers of both offerings because he represents a subclass including persons who purchased Friedman's stock pursuant to both the February 6, 2002 and September 19, 2003 offerings, and "both offerings originate from the same materially false and misleading Registration Statement." (Pls.' Opp'n to Def. E & Y's Mot. to Dismiss at 24 n. 8; Compl. ¶ 335.) Defendant E & Y has not presented any authority justifying dismissing Plaintiffs' Section 11 claims for lack of standing in these circumstances.[30] Defendant's reli-

---

**29.** Because the Court finds Plaintiffs do not have standing to sue Defendant ABN, the Court need not address Defendant's remaining arguments.

**30.** E & Y's involvement in both offerings distinguishes it from Defendant ABN. The Sec-

tion 11 claims against ABN were dismissed because Plaintiffs lacked standing to assert them. Defendant ABN was the underwriter for only the February 2002 offering; it was not involved in the September 2003 offering.

ance on *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F.Supp.2d at 159–62, is misplaced. *Transkaryotic Therapies* holds that a Section 11 claim must be dismissed if no plaintiffs can trace the purchase of stock to the offering at issue. *Id.* Here, Plaintiffs' standing for the February 2002 offering is sufficient because Plaintiff Bortel has standing to bring claims arising from the September 2003 offering, the February 2002 and September 2003 offerings allegedly incorporate similarly misleading financial statements, Defendant E & Y accepts that some class member purchased shares from the February 2002 offering, and E & Y's involvement in the two offerings is similar because it audited the Company's 2000, 2001 and 2002 financial statements. That the named Plaintiff did not purchase shares pursuant to the February 2002 offering may be addressed at a later stage, but, in light of the factors stated above, there is insufficient legal authority to dismiss the Section 11 claims against E & Y at this time.[31]

### D. *Control Person Claims*

Plaintiffs assert control person claims under Section 15 of the Securities Act and Section 20 of the Exchange Act against the Individual Defendants and Control Person Defendants. To allege control person liability, Plaintiffs must allege that (1) the company violated the securities laws, (2) the defendant had the power to control the general affairs of the company, and (3) the defendant had the power to control the specific corporate policy that resulted in the primary violation. Each of the Defendants against whom Plaintiffs assert control person claims initially contends the

control person claims fail because Plaintiffs have not pleaded a primary violation of the securities laws. As discussed above, Plaintiffs have pleaded primary violations of the securities laws.

#### 1. *Defendant Stinn*

█ Defendant Stinn asserts the control person claims against him should be dismissed because Plaintiffs have failed to allege facts to establish Defendant Stinn was a "control person" for the purpose of imposing liability under the securities laws.

█ To establish control person liability, Plaintiffs must allege facts demonstrating Defendant Stinn had the power to control the general affairs of the Company and the power to control or influence the specific corporate policy underlying the alleged primary violation of the securities laws. Defendant Stinn was the Company's CEO during the class period, and, as such, signed the Company's SEC filings which Plaintiffs allege were false and misleading. As set forth in the Court's discussion regarding Plaintiffs' allegations evidencing Defendant Stinn's scienter, *supra,* Plaintiffs detail Defendant Stinn's intimate involvement in the day-to-day operations of the Company, and further allege his involvement with the policies underlying the alleged primary securities laws violations. Such allegations are sufficient, at this stage of the proceedings, to allege Defendant Stinn was a control person of the Company.

#### 2. *Defendant Mauro*

Defendant Mauro claims he is not a control person. Plaintiffs allege Defen-

---

**31.** *See In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 2000 WL 1357509, *3 (S.D.N.Y. Sept. 20, 2000) ("Courts have repeatedly held that on allegations such as these, class representatives need not have invested in each security so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security. Courts have not addressed this concern vis a vis the doctrine of standing, but rather have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement.").

dant Mauro was part of a group that set the allowance for uncollectible accounts (Compl.¶ 162), and that he and Defendant Suglia had authority to purchase goods from and direct payments to Cosmopolitan, as part of the alleged scheme to defraud Capital Factors. (*Id.* ¶ 181.) Plaintiffs' allegations regarding Defendant Mauro's scienter, discussed *supra*, including his participation in key aspects of the Company's alleged GAAP violations and alleged preparation of financial information, sufficiently allege Defendant Mauro's control over the general affairs of the Company and the specific policies underlying the alleged violations of the securities laws.

### 3. *Defendant Anderson*

■ Defendant Anderson argues Plaintiffs have not alleged he had any role in Friedman's financial reporting policies that gave rise to the alleged primary violations by the Company, and, therefore, the control person claims against him must be dismissed. (Def. Anderson's Mot. to Dismiss at 22.) Plaintiffs claim his control of revenue recognition and uncollectible accounts is alleged sufficiently because Defendant Anderson played an integral role in implementing the Company's collection policies and attended meetings where the Company's performance was discussed. Because these operations resulted in the alleged fraud, Plaintiffs claim they have stated successfully a claim for control person liability against Defendant Anderson. Defendant Anderson concedes he exerted general control over the Company's operations during the class period, and does not contest involvement in many of the underlying practices on which the fraud claims are based. The Company's financial reporting, however, is what forms the basis of Plaintiffs' claims, not the operations themselves. That Defendant Anderson set the Company's collection policies is irrelevant because it was the resulting financial

accounting for accounts receivable that is being challenged in this lawsuit. His mere attendance at meetings where the Company's financial performance was discussed does not lead to the conclusion that he controlled the particular policies that give rise to the alleged violations of the securities laws or how the Company reported the financial results for such operations. Because Plaintiffs have not alleged facts demonstrating Defendant controlled or influenced the particular practices or policies alleged to have violated the securities laws, Plaintiffs have failed to state control person claims against Defendant Anderson.

### 4. *MS Jewelers Defendants and Morgan Schiff*

Defendants move to dismiss the claims against them on the basis that Plaintiffs have not alleged that Morgan Schiff and MS Jewelers are "control persons" under Sections 20(a) and 15. The SEC's implementing regulations define "control" as "the possession, direct or indirect, or the power to direct or cause the direction of the management policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. To qualify as control persons, Plaintiffs must demonstrate these Defendants both (a) had the power to "control the general affairs of the entity primarily liable at the time the entity violated the securities laws," and (b) had the power to "directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *Brown v. Enstar Group, Inc.,* 84 F.3d 393, 396 (11th Cir.1996). Because Plaintiffs have not pleaded sufficient facts demonstrating either Morgan Schiff or MS Jewelers had either general or specific control of the Company and its allegedly false statements, Defendants argue the control person claims must be dismissed.

Plaintiffs' allegations against MS Jewelers and Morgan Schiff focus on Defendant Cohen. Defendant Cohen is the sole owner of both MS Jewelers and Morgan Schiff. Plaintiffs allege MS Jewelers had the sole right to vote Friedman's Class B common stock, which Plaintiffs allege allowed MS Jewelers to appoint seventy-five percent of the Company's board of directors and, therefore, to control the Company. Plaintiffs further allege Morgan Schiff has served as financial advisor to Friedman's since 1994, received substantial fees from Friedman's for financial consulting in 2001 and 2002, and that Morgan Schiff and Friedman's shared many officers and directors. Plaintiffs claim, therefore, "as financial advisor to Friedman's for more than ten years, Morgan Schiff, and thus Cohen, were in a position to know and direct both the general financial affairs of Friedman's as well as the specific actions giving rise to the fraud." (Pls.' Opp'n to MS Jewelers Defs.' Mot. to Dismiss at 13–14.)

Based on MS Jewelers' alleged control of the composition of the board of directors, MS Jewelers had the ability to control the general affairs of the Company. Similarly, Morgan Schiff, which served as financial advisor and had high-level ties to the Company arguably had the ability to influence the general affairs of the Company. "The crucial question is whether each had 'control' or 'influence' over the specific corporate policy forming the basis for the defendants' claims." *In re Towne Servs., Inc.*, 184 F.Supp.2d at 1328. In *In re Towne Services, Inc.*, the Court found plaintiffs' "allegations suffice to show that the individual defendants were sufficiently involved with the particular activities of Towne leading to the allegedly actionable omissions." *Id.* Plaintiffs in this case, however, have not made any allegations that these Defendants exercised "control" or "influence" over the specific corporate policies which form the basis for Plaintiffs'

claims. Plaintiffs' allegations against these Defendants are simply too removed from the conduct at issue here, too conclusory and otherwise insufficient as a basis to impose control person liability on these Defendants. While MS Jewelers may have had authority to control the Company through its ability to appoint seventy-five percent of the Company's board of directors, Plaintiffs have not alleged any facts indicating MS Jewelers was responsible for the specific conduct on which Plaintiffs' claims are founded. Similarly, Morgan Schiff's position as financial advisor to the Company does not indicate it controlled the specific policies at issue in this case sufficient to impose liability as a controlling person under the securities laws. That Morgan Schiff was wholly-owned by Defendant Cohen and shared some officers and directors with the Company does not affect this conclusion. Plaintiffs have not pleaded facts demonstrating the MS Jewelers Defendants or Morgan Schiff controlled or influenced the specific corporate policies underlying Plaintiffs' claims for primary liability. Consequently, Plaintiffs have not alleged sufficiently control person claims against these Defendants under Sections 15 and 20.

### 5. *Defendant Cohen*

Plaintiffs assert claims against Defendant Cohen as a control person under Sections 15 and 20(a). As discussed above, Plaintiffs must demonstrate Defendant Cohen both had the power to control the general affairs of the Company and had specific control over the polices that form the basis of the underlying primary violations of the securities laws.

Plaintiffs allege Friedman's September 18, 2003 prospectus states Defendant Cohen: (i) controls the outcome of most matters submitted to a vote of the shareholders, (ii) exercises significant control over

the Company's business and polices, (iii) has the power to appoint new management, (iv) has the power to prevent or cause a change in control of the Company, and (v) has the right to elect up to seventy-five percent of the Company's directors. (Compl.¶ 13(a); Pls.' Opp'n to Def. Cohen's Mot. to Dismiss at 2.) Plaintiffs also claim Defendant Cohen reaped millions in financial consulting and advisory fees paid by the Company to Morgan Schiff, which Cohen controlled, and further claim Defendant Cohen improperly influenced the Company's dealings with Crescent, which was also owned and controlled by Defendant Cohen. Plaintiffs also allege the "interlocking officers and directors" of the various related companies owned by Defendant Cohen demonstrate his control of the Company. For example, Defendant Stinn served as both Crescent's and Friedman's CEO and Chairman, and Defendant Suglia served as each company's CFO. (Compl.¶¶ 13(b)-(c).) In short, Plaintiffs claim Defendant Cohen "possessed and exercised a firm grip over all aspects of [the][C]ompany's business operations through a complex structure of majority ownership interests in his numerous companies and control over those companies' management and directors." (Pls.' Opp'n to Def. Cohen's Mot. to Dismiss at 5.)

Viewing the allegations in the light most favorable to Plaintiffs, Defendant Cohen controlled the general affairs of the Company through his control of the board of directors, management, significant policies, and interrelated companies. Defendant Cohen's control of Crescent and Morgan Schiff, alleged influence and control over those directly responsible for operations at the companies controlled by him, and Friedman's admissions of the extent of Defendant Cohen's control of the Company, are sufficient at this stage of the proceedings to allege Defendant Cohen controlled the Company generally and specifically controlled and influenced the

policies at issue in this case. *See generally AFC Enters., Inc. Sec. Litig.,* 348 F.Supp.2d at 1381 ("Generally, status as a control person is a question of fact."). Accordingly, Plaintiffs have pleaded sufficient facts to establish potential control person claims against Defendant Cohen.

### III. *CONCLUSION*

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Douglas Anderson's Motion to Dismiss the Consolidated and Amended Class Action Complaint [70], ABN AMRO Rothschild LLC's Motion to Dismiss Plaintiffs' Corrected Consolidated and Amended Class Action Complaint [88], and Morgan Schiff & Co., Inc., MS Jewelers Corp., and MS Jewelers LP's Motion to Dismiss [75, 76] are **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Ernst & Young's Motion to Dismiss Plaintiffs' Corrected Consolidated and Amended Class Action Complaint [62] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendant Sterling B. Brinkley's Motion to Dismiss [65], the Outside Director Defendants' Motion to Dismiss Plaintiffs' Consolidated and Amended Class Action Complaint [66], Defendant Bradley J. Stinn's Motion to Dismiss Plaintiffs' Complaint [67], the Underwriter Defendants' Motion to Dismiss Plaintiffs' Corrected Consolidated and Amended Complaint [68], Defendant John Mauro's Motion to Dismiss Amended Complaint [96], and Phillip E. Cohen's Motion to Dismiss [108] are **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to File Excess Pages [103], Plaintiffs' Motion for Leave to File a Sur–Reply Memorandum [132], and

Defendant Ernst & Young's Motion to Supplement [145] are **GRANTED**.